# Richmond

J. GRAHAM EDWARDS, ET ALS., ETC. V. JAMES E. CUTHBERT,
ET ALS., ETC.

November 19, 1945.

Record No. 2952.

Present, All the Justices.

The opinion states the case.

*Alexander H. Sands* and *Alexander H. Sands, Jr.*, for the appellants.

*John B. Lightfoot, Jr.*, for the appellees.

HOLT, J., delivered the opinion of the court.

James E. Cuthbert and Miss Thomasine Claire Edwards were married on November 29, 1941. On January 2, 1942, she wrote this will:

"Not unmindful of my husband, James E. Cuthbert, I, Thomasine Claire Edwards Cuthbert, on this the second day of January, nineteen hundred forty two, designate my brother, J. Graham Edwards and my sister, Gourley Edwards

Hoes, as beneficiaries of my entire estate, they to divide it according to their agreement with each other. It being my desire that each shall share equally as nearly as possible, but not at the sacrifice of untimely sales of stocks, unless they desire such sacrifice.

"Evidence of my assets may be obtained at the Morris Plan Bank of Richmond, First & Merchants Bank of Richmond, Fenner & Beane of Richmond. Many valuable chattels, linen, silver & Household effects; etc. now at the home of my mother in Surry county, Virginia, are specifically included in this will, as well as jewelry and other belongings now at 151 Carrol avenue, Petersburg, Virginia.

"My brother & sister above named to act jointly as executor & executrix. However, should it be necessary to have local counsel, meaning within the State of Virginia I suggest the advice of the First & Merchants Bank of Richmond.

"(Seal)   THOMASINE CLAIRE EDWARDS CUTHBERT."

She committed suicide on February 15, 1942. Her will was offered for probate on February 18, 1942. The named executors qualified, and since they were both non-residents C. H. Flexom, a resident, qualified as administrator c.t.a. On February 24, 1942, the husband filed a formal renunciation, which said in part:

"By these presents the said James E. Cuthbert hereby doth claim the distributive share of the personal estate of his said deceased wife to which he is entitled by virtue of section 5273 and 5276 of the Code of Virginia now in effect, to-wit, one-half the surplus, as defined by section 5273 of said Code, of the personal estate of his said deceased wife; * * * "

This suit was instituted on August 16, 1943. In it the husband asked that there be paid over to him the distributive share of his wife's estate, to which he is entitled following his renunciation of the will, which in this case is one-half of the surplus. Code, section 5276.

There are ten assignments of error, all of which are insisted upon. Three were stressed in argument. The major

contention of these legatees is that the wife had been constructively deserted by her husband and that he is now entitled to no part of her estate. Code, section 5140.

It is next said that he should be made to pay funeral expenses, and again that in any event the value of this estate should be fixed as of the date of the decedent's death, February 15, 1942, and not as of the date of the final decree in this cause, October 2, 1944.

There was no ante-nuptial contract.

Miss Edwards at the time of her marriage was forty-three years old and lived on a farm in Surry county. Her husband, Mr. Cuthbert, was sixty-seven years old and lived in Colonial Heights, Chesterfield county. Over this Cuthbert home a sister, Miss Blanche Cuthbert, seventy-one years old, presided and had presided for a number of years; and it was to it that Mr. Cuthbert took his wife.

Mrs. Hoes, a legatee and sister, said that for a year or two preceding her marriage Miss Edwards was very unhappy, with many disappointments; that her condition was nervous; that she was dissatisfied with the way her Surry farm was being run; and, as a consequence thereof, she wanted to get away. She knew that Miss Blanche Cuthbert then presided in the Chesterfield home and that it was to be her home following her marriage. To it she went. Her life there was anything but a happy one. She found Miss Blanche Cuthbert queer and dominating. She (the sister) continued to preside in the Cuthbert home and refused to permit Mrs. Cuthbert any voice over its control or management. The unhappiness which followed led her, as we have seen, to kill herself on February 15, 1942.

She complained bitterly of this situation to her brother and sister, legatees, and to her husband, who promised to do what he could to remedy the situation.

This home, to which she had gone, consisted of ten rooms on one floor. This arrangement made it possible to divide the home into two apartments, each consisting in part of a living room, a bedroom, dining room, bathroom and kitchen,

with separate entrances on separate porches, and this work of readjustment was about completed at the time of her death. She made no complaint of her treatment at the hands of her husband, but said that he extended to her every sympathy and consideration. During her life there, she made no attempt to leave the home or suggested that she might leave it.

Appellants rely heavily upon *Fischer* v. *Fischer* (1943), 182 Md. 281, 34 A. (2d) 455. It is there said:

"A wife is entitled to a home which is under her control, and is justified in leaving if the husband permits his mother or other of his relatives to dominate the household, or if he insists on her living with relatives with whom her relations are unpleasant. These statements are not absolute, and no rule of general application can be formulated, each case being based largely on its own circumstances."

To the same effect, see note 47 A. L. R. 687; 17 Am. Jur. 203, Divorce and Separation.

In the *Fischer Case*, the husband lived with his mother. The wife knew in the beginning that the mother-in-law objected to her coming and wanted the home for her own. The wife asked her husband to take her out of the place and said that she could not live there under existing conditions. He refused, and she said that she was going to do something about it. The husband replied: "Well, go ahead and go." These conditions continued for more than two years. They became worse and not better. A baby was born. She did "go ahead" and left.

In the West Digest of that case, Atlantic Digest, Divorce 37(16), the conditions under which a divorce is warranted are thus accurately summarized:

"Where husband, though able to do so, made no attempt to provide a separate home for his wife and child, but insisted upon wife's living in home run by husband's mother, and husband treated wife's complaints as complaints of a child, wife was justified in leaving the husband, and was entitled to divorce on ground of 'constructive desertion.' "

This husband was wealthy and amply able to provide his wife with another home.

The converse of the proposition contended for we have stated in *Hendry* v. *Hendry*, 172 Va. 368, 1 S. E. (2d) 340, where this court, speaking through Mr. Justice Gregory, said:

"We have held that one spouse is not justified in leaving the other unless the conduct of the wrongdoer could be made the foundation of a judicial proceeding for divorce. Nothing short of such conduct will justify a wilful separation or a continuance of it. *Towson* v. *Towson*, 126 Va. 640, 102 S. E. 48; *Gentry* v. *Gentry*, 161 Va. 786, 172 S. E. 157."

In the instant case, these unhappy conditions continued for only two and one-half months. The wife was neurotic when she went into the home. Her husband treated her with the utmost kindness. He is not a wealthy man but promised to do everything in his power to remedy conditions about which the wife complained and had about given the wife all that she asked for a day or two before she killed herself. She never suggested that she leave the home, and there is nothing to indicate that she had any such purpose in her mind. In the *Fischer Case*, the wife had actually left the home.

Constructive desertion under certain conditions may be established, but it is not warranted under those which here obtained.

There is something unreal in the contention that Mrs. Cuthbert could have successfully prosecuted a suit for divorce from a husband who treated her with kindness and consideration while she continued to live with him, share his room and sleep with him; and this at a time when there had been no break in their marital relations. *Tarr* v. *Tarr*, *ante*, p. 443, 35 S. E. (2d) 401, opinion handed down by this court on October 8, 1945.

It is next said that the husband is primarily liable for his wife's funeral expenses, in amount $647.50, and in support

of this *Hall* v. *Stewart*, 135 Va. 384, 116 S. E. 469, 31 A. L. R. 1489, is cited and relied upon.

At common law, a husband was charged with the funeral expenses of his wife. Upon marriage he took over all of her property, and the least that he could do was to bury her when the time came. Equity intervened, and the doctrine of equitable separate estates became firmly established. Now the property rights of women, married or unmarried, are in Virginia, in the main, fixed by statute.

In the *Hall Case* the husband incurred the funeral expenses, paid them and sought to recover them from his wife's estate. The court there said:

"We express no opinion as to the liability of the estate of Mrs. Stewart for her funeral expenses to the person furnishing them, if they had asserted their claims against her estate, for that question is not before us. But there was a common law liability on her husband for these expenses, the credit was extended to him, and he paid the debt, and we are of opinion that he cannot recover back the amount from his wife's estate."

Here the burial expenses were incurred by the executor-legatees. Credit was extended to them and paid by them after the husband had filed his renunciation. Claim for reimbursement was first made in their cross-bill of October 11, 1943.

In the *Hall Case*, all of the estate was real estate; here it is all personalty. There a sharp distinction is drawn between real and personal estate.

Section 5395 reads:

"Real estate of decedent to be assets for payments of debts in same order as personal estate.—All real estate of any person who may hereafter die, as to which he may die intestate, or which, though he die testate, shall not by his will be charged with or devised subject to the payment of his debts, or which may remain after satisfying the debts with which it may be so charged or subject to which it may be so devised, shall be assets for the payment of the decedent's

debts and all lawful demands against his estate, in the order in which the personal estate of a decedent is directed to be applied."

Nothing is said about surplus.

Code, section 5138 declares: "When a married woman, having title to any estate, dies intestate, as to the said estate, or any part thereof, it, or such part, shall pass according to the provisions of chapter two hundred and thirteen, subject to her debts, and to the curtesy of her husband, should he survive her."

The court said that this section must be construed to mean that where a wife's estate consisted of real estate that real estate passed under section 5264, which makes no mention of funeral expenses and no mention of surplus and that funeral expenses are not her debts. On the other hand, Code, section 5390, declares that no part of the personal estate shall be applied to decedent's debts until the costs of administration and funeral expenses have been paid.

Section 5273 deals with the personal estate of the decedent and declares that there shall be no distribution until costs of administration, funeral expenses and debts have been paid. To the same effect is Code, section 5276.

The court there said:

"This section makes no mention of costs of administration, funeral expenses or debts, nor does it mention any surplus after the payment of these items as is done in section 5273 of chapter 213, relating to the distribution of personal estate."

We are safe in saying that this case does not undertake to deal with an estate entirely personal. When the estate is entirely personal, its surplus passes to distributees, but that surplus cannot be ascertained until funeral expenses have been met.

It is next said that the court should have accepted the value of the estate as of the date of the death of decedent, February 15, 1942, not as of its final decree, October 2, 1944. This estate at the date of the death of decedent consisted of inconsiderable tangible personal property, money

in bank, $4,432.18, and common stock in sundry corporations worth on the market as of February 18, 1942, $6,333.75. On February 28, 1944, the Commissioner to whom this case had been referred reported that the market value of these stocks then was $10,733.50. This husband was entitled to receive his share in his wife's estate as of the date of the death of his wife and certainly as of the date of his renunciation. This right these executor-beneficiaries failed and refused to recognize. They were required to settle their accounts within the year. No appraisement of the estate was made until July 12, 1943. These stock certificates were taken out of the State. Everything possible was done to defeat the husband's claim and to delay distribution. He was denounced as a "gold-digger," and Mrs. Hoes told Mr. Flexon that "they would spend every cent of the money left, to keep him from getting one cent." Plainly they should not be permitted to profit by their own recalcitrant attitude.

The other assignments do not merit discussion in detail. We find no error in the record. The cause is affirmed and remanded.

*Affirmed and remanded.*