# Richmond

PERCY ELMO LAWYER v. ELDA LENA LAWYER.

June 13, 1966.

Record No. 6171.

Present, Eggleston, C. J., and Spratley, Snead, I'Anson, Carrico and Gordon, JJ.

*A. Simpson Williams, Jr.* (*Keith, Williams & Daniel,* on brief), for the appellant.

No brief or argument for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This cause was instituted on April 8, 1963, by Percy Elmo Lawyer, appellant, against his wife, Elda Lena Lawyer, appellee, for a divorce *a mensa et thoro* on the grounds of wilful desertion and abandonment. Mrs. Lawyer filed an answer and cross-bill, in which she denied desertion of her husband, and, in turn, charged him with

"cruelty and constructive desertion." She prayed that a divorce *a mensa et thoro* be granted her, and that her husband be required to provide her alimony and counsel fees. Lawyer answered the cross-bill, denying all allegations of cruelty and desertion.

On May 8, 1963, the trial court ordered Lawyer to pay $18.50 each week to his wife for her support and maintenance, the sum of $125.00 on account of fees for her counsel and $25.00 for costs of court.

Thereafter, on April 28, 1964, on evidence taken by depositions, the court dismissed complainant's bill and granted Mrs. Lawyer a divorce from bed and board on the ground that her husband was "guilty of cruelty and acts which constituted constructive desertion." It then ordered Lawyer to continue to pay $18.50 each week to Mrs. Lawyer, and the further sum of $300.00 to her counsel.

On appeal, Lawyer contends that the court erred in each of its findings and orders. Mrs. Lawyer assigns no cross-error, and has filed no brief in opposition.

The parties were married on August 26, 1955, in Boston, Massachusetts. At that time, Lawyer was a member of the armed forces of this country. He was 47 years of age, and had been married twice previously, both marriages being ended by divorce. Mrs. Lawyer was a widow, 48 years of age, with two sons, 25 and 28 years of age, born of her first marriage. No children were born of the marriage here involved. After their marriage in Massachusetts, Lawyer remained in the Army until the latter part of 1962. The couple lived in several places where Lawyer was stationed as a soldier, including the State of New York and the country of Japan, in which country they lived for about three years.

Prior to Lawyer's discharge from military service, he and his wife had planned to live in Richmond, Virginia. In the summer of 1962, Lawyer and his wife came to Richmond, visited Mrs. Alice K. Pangola, aunt of Lawyer, in her home on Laburnum Avenue, and occupied a bedroom in the basement of the Pangola home for approximately a week. After his discharge from the Army, the couple came again to Richmond, on or about November 1, 1962. Under an agreement with Mrs. Pangola, they took up their residence in the bedroom in the basement of the Pangola home, the same room which they had occupied in the previous summer. They were granted the full use of the first floor facilities of the house, including the kitchen, the dining room, the living room, and a bathroom. The

basement bedroom is separately enclosed, has a wooden flooring, a window above the ground level, electric lights, and heat from an oil furnace located near the bedroom enclosure. It was furnished with a double bed, a table, several chairs, and the usual furniture for a bedroom. In the basement there is a toilet with a sink, a commode, and bath shower near the bedroom.

It was understood that the Lawyers would occupy the above quarters until Lawyer could find employment in Richmond, and obtain funds to rent or buy a home for himself and wife.

Mrs. Lawyer obtained employment as a sales clerk two days after arrival in Richmond with a "take-home pay" of about $32.00 each week. She also received a quarterly dividend of about $30.00 from a utility company on stock valued by her as worth $1,900.00.

Lawyer was successful in obtaining employment about the first of February, 1963, as a dispatcher for the Public Utility Department of the City of Richmond. His "take-home pay" was $200.00 per month; and, in addition, he received $139.12 monthly pension for his military service. He had no other financial resource. Out of his income he purchased some of the food consumed by Mrs. Pangola, his wife and himself; and, in addition, paid the bills for the utilities servicing the house.

Mrs. Lawyer prepared her husband's breakfast each morning, and Mrs. Pangola prepared their dinner in the evening. Mrs. Lawyer bore no portion of the family expenses, nor did she assist Mrs. Pangola in the latter's daily household chores.

Mrs. Lawyer soon became dissatisfied, and repeatedly told Lawyer that he should find a job that paid him a larger salary, so that they could obtain better living accommodations. During their discussions, they often became heated and angry. However, they investigated and inspected twenty or thirty houses listed for rent or sale; but were unable to find one that satisfied the desire of each and was priced at an amount they could pay.

On March 25, 1963, Lawyer found a house for sale at $9,250.00, which he planned to purchase with the aid of a loan from the Veterans Administration. A real estate agent brought a proposed contract of sale to the Pangola home to secure the signatures of Mr. and Mrs. Lawyer. Mrs. Lawyer refused to sign the contract, protesting that the property was not worth the amount charged for it.

Lawyer testified that: "Her primary objection seems to be that it is not high-class enough. She said she wanted a three-bedroom

brick ranch with a basement. If she didn't have that, she was not going to have anything else. I couldn't afford it. I did tell her that if she sold her stock and put it on the house, we could buy such a house. She refused."

The next night, March 26, Mrs. Lawyer told her husband that she was leaving and would not be back. He pleaded with her to stay, saying that he had taken out an insurance policy at a cost of $20.00 per month which guaranteed her an income as long as she remained his wife. Nevertheless, Mrs. Lawyer rented a room in another part of the city, and on March 27, 1963, she moved from the Pangola home, again saying that she would not return.

For some weeks prior to her removal from the Pangola home, Mrs. Lawyer slept at night, on the first floor of the residence, either on a sofa bed in the living room, or on a single bed, in the bedroom occupied by Mrs. Pangola. Lawyer says she did this over his protest.

Mrs. Pangola testified that the basement room was closed off, amply furnished, clean and dry, and had been occupied by some of her relatives and others for several years without complaint; that Lawyer and his wife frequently had "arguments" about his failure to obtain a better job; that she got along "fairly well" with Mrs. Lawyer and wanted the latter and her nephew "to stick together;" that she had never seen Lawyer strike his wife, nor commit any act which would "be considered abuse of her;" and that the couple spent most of the time that they were living in her home "upstairs in the kitchen or the dining room, but were supposed to sleep in the basement." She said that Mrs. Lawyer had frequently stated, in the latter portion of her stay in the home, that she was going to leave, and on March 27, 1963, she did leave.

Mrs. Lawyer testified that her husband cursed and abused her almost daily, and because of this abuse and inadequate living accommodations, she left him. Her testimony was in vague and general terms, except as to one incident, when she said he pushed her against a wall and struck her. There was no corroborating evidence of the incident, the only specific occasion recalled by Mrs. Lawyer, and it was flatly denied by her husband. (Virginia Code, 1950, § 20-99, 1960 Repl. Vol.)

Mrs. Lawyer admitted that she was "never in fear of being injured." She did not complain of any interference in her affairs by Mrs. Pangola. She admitted that she never made any financial contribution to the running of the household, and that she was not

willing to use any part of her money towards the purchase of a home.

The conduct of Mrs. Lawyer, her renting of a room in another house, her departure from the Pangola home, her parting words to her husband, and her failure to heed his pleas, plainly show that she voluntarily and wilfully deserted and abandoned him with the intention to break off their marital relations.

It is true that it was the duty of the husband to provide his wife with a home with the comforts and necessities of life within his means, and the record shows that the husband endeavored to comply with that duty. Mrs. Lawyer has shown no legal justification for the desertion of her husband, and no good excuse for her failure to return to him. She is, therefore, not entitled to a divorce.

The evidence and circumstances stated establish the right of the husband to a divorce. The refusal to grant him a divorce *a mensa et thoro* was erroneous. Consequently, the court erred in requiring him to provide funds for the maintenance and support of Mrs. Lawyer. *Mullen* v. *Mullen*, 188 Va. 259, 275, 49 S. E. 2d 349; *Stolfi* v. *Stolfi*, 203 Va. 696, 702, 126 S. E. 2d 923.

We have repeatedly held that one spouse is not justified in leaving the other, unless the conduct of the other is sufficient to establish the foundation of judicial proceeding for a divorce. *Hendry* v. *Hendry*, 172 Va. 368, 374, 1 S. E. 2d 340; *Kerr* v. *Kerr*, 182 Va. 731, 735, 30 S. E. 2d 684; *Edwards* v. *Cuthbert*, 184 Va. 502, 507, 36 S. E. 2d 1; *William* v. *Williams*, 188 Va. 543, 550, 50 S. E. 2d 277; *Stolfi* v. *Stolfi*, supra, 203 Va., page 701.

For the reasons stated, we reverse and vacate the trial court's decree of April 28, 1964. A decree of divorce *a mensa et thoro* is hereby awarded Percy Elmo Lawyer; and the case is remanded to the trial court for further hearing and decision on the question of a divorce *a vinculo* should proper proceedings and evidence be produced.

*Reversed and remanded.*