# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

ROBERT HARVEY RAIFORD v. LORRAYNE SPEAR RAIFORD.

January 21, 1952.

Record No. 3865.

Present, All the Justices.

The opinion states the case.

*W. L. Devany, Jr.,* for the appellant.

*R. Stanley Hudgins,* for the appellee.

Hudgins, C. J., delivered the opinion of the court.

Lorrayne S. Raiford instituted this suit for divorce charging her husband, Robert H. Raiford, with desertion. He filed an answer denying the material allegations of the bill. The court, pursuant to a rule of practice adopted by it in 1949, and over the objection of defendant, referred the cause to a commissioner in chancery. The case came on to be heard on the pleadings, the evidence, the commissioner's report and the exceptions taken to the report by both parties. The court sustained complainant's exception to the award of $50 per month alimony, increased the amount to $100 per month, and awarded her a divorce *a mensa*.

The parties will be designated as "complainant" and "defendant," in accordance with the positions occupied by them in the lower court.

The important question presented is whether the trial court had power to adopt the following rule governing practice in suits for divorce:

"ORDER ESTABLISHING RULE OF PRACTICE TO BE OBSERVED IN DIVORCE SUITS AND SUITS FOR ANNULMENT OF MARRIAGE, ENTERED APRIL 11, 1949.

"In order to safeguard the public interest against litigants who may seek divorces or annulments of marriage in cases in which such litigants have not acquired the necessary residence and domicile as required by Section 5105 of the Code of Virginia, or where the grounds of venue as required by said Section do not exist, and to better determine whether there be legal cause for divorce or annulment in any given case the following rule of practice in this court is hereby established:

"All such suits shall, by appropriate decree, be referred to one of the Commissioners in Chancery of this court to ascertain and report whether or not the necessary grounds of jurisdiction and venue exist and, if so, whether said divorce or annulment should be granted, and upon all other matters raised by the pleadings and the evidence.

"All of the evidence in such cases shall be taken and transcribed before such Commissioner who shall have authority to direct the Clerk of this Court to issue subpoenas for witnesses and to make such investigation as may be proper and necessary to accomplish the purpose of this rule.

"The complainant shall pay the cost for issuance and service

of such subpoenas and shall also pay to said Commissioner in advance of such hearing a fee of Twenty-Five Dollars to be taxed as part of the cost.

"This rule shall apply to all suits for divorce or suits to annul a marriage instituted on and after April 12, 1949."

The general rule is that a court of general jurisdiction may adopt a rule of practice provided the subject is not regulated, or adequately provided for, by general law. Such a rule must be reasonable, must not contravene the Constitution or statutes, or affect substantive law. 21 C. J. S., Courts, sec. 172, p. 266; 14 Am. Jur., Courts, sec. 152, pp. 357-359.

It was held in *Hall* v. *O'Brien*, 97 W. Va. 77, 124 S. E. 507, that circuit "* * * courts have ample power to adopt reasonable rules for conduct and dispatch of business, including the power to interpret and apply them, unless they are in conflict with law and unreasonably oppressive, or obstructive of the rights of litigants."

The rule is not forbidden by statute, nor is it in conflict with the Rules of the Supreme Court of Appeals governing practice and procedure in trial courts.

Promulgation of the rule by the Court of Law and Chancery of the City of Norfolk was not an isolated action of one court. The necessity for such a rule had been discussed at length by the bench and bar of the Commonwealth prior to its adoption. At the annual meeting of the Virginia State Bar in 1949 the Judiciary Committee, composed of Honorable Richard B. Spindle, Chairman, Honorable Lemuel F. Smith, Honorable J. Douglas Mitchell, Honorable Kennon C. Whittle, and Honorable Walter T. McCarthy, recommended the adoption of a rule referring all suits for divorce to a commissioner in chancery. The following is an excerpt taken from the minutes of that meeting showing approval of the report:

"There were enthusiastic expressions from the floor for the work and recommendations of the Committee, and, following some discussion, on motion duly made and seconded, the report of the Committee was approved by unanimous vote."

The judge of the Third Judicial Circuit, on request of the bar of that circuit, adopted a rule of practice requiring certain issues in suits for divorce to be referred to a commissioner in chancery. We are informed that a similar rule has been adopted by a number of other courts, among them the courts of the

Sixteenth and Thirty-fifth Judicial Circuits. The approval by so many distinguished members of the bench and bar who are compelled to conform to the practice, is sufficient to make out a *prima facie* case as to the reasonableness of the rule.

The rule does not affect a substantive right of defendant, even if it be regarded as a change in practice and procedure. Such change may affect the form of the remedy, but does not affect a vested or substantial right. *Page v. Belvin,* 88 Va. 985, 990, 14 S. E. 843; *Jones v. Commonwealth,* 86 Va. 661, 664, 10 S. E. 1005; *Shickel v. Berryville Land, etc., Co.,* 99 Va. 88, 37 S. E. 813.

Defendant contends that the rule is contrary to well established practice and procedure in suits in equity. In support of this contention he relies on that part of Code, sec. 20-99 providing that "Such suit (for divorce) shall be instituted and conducted as other suits in equity * * *."

One of the distinguishing features between suits in equity and actions at law is the power of the chancellor, in his discretion, to refer questions in a suit in equity to a commissioner in chancery to prepare the cause and place it in a better position to enable the chancellor to decide it expeditiously and correctly.

There is a line of cases (many of them reviewed or cited in the recent case of *Binkley v. Parker,* 190 Va. 380, 57 S. E. (2d) 106) declaring that an order of reference should not be awarded to enable the plaintiff to make out his case. The cause should be so far developed by the pleadings and proof as to show the propriety of an order of reference for an accounting. *Porter v. Young,* 85 Va. 49, 6 S. E. 803; 1 Hogg's Equity Procedure, 3d ed., sec. 618, p. 764, and cases cited in the footnote. The two reasons given in support of this holding are the expense and delay incident to referring a cause to a commissioner before first determining whether an accounting is necessary. See *Watkins v. Young,* 31 Gratt. (72 Va.) 84, 94, where 2 Rob. Pract. (old), p. 359, is quoted to the same effect. These reasons were advanced when it was the custom for a commissioner in chancery to write the depositions and his report in longhand which necessarily took time. But in this modern age, when depositions are taken by an expert stenographer to whom the report is usually dictated, there should be little, if any, delay in preparing the record for final disposition.

Referring suits for divorce to a commissioner may increase,

to some extent, the costs to the litigant, but such increase is infinitesimal when compared with the importance of maintaining inviolate the public policy of the Commonwealth as declared in the statutes hereinafter cited, and maintaining the sanctity of marital relations. No case is cited in the briefs, and we have found none, where the decree of the lower court was reversed solely on the ground that an order of reference was improperly made.

Defendant's main contention is that the rule is invalid because it authorizes the court to delegate its judicial functions to a commissioner in chancery.

A commissioner in chancery is an officer appointed by the chancellor to aid him in the proper and expeditious performance of his official duties. Originally such officer was called a "Master Commissioner," but now his usual designation is "Commissioner in Chancery."

■ Code, sec. 8-248, empowers every court having chancery jurisdiction, or the judge thereof in vacation, to "appoint such commissioners in chancery as may be deemed necessary for the convenient dispatch of the business of such court. Such commissioner shall be removable at pleasure." Other statutes (8-249 to 8-262) deal with the procedure before the commissioner and the weight to be given his findings. These statutes do not limit or restrict the court as to the class of case that it may refer to a commissioner. The court, acting within its sound discretion, must determine when the convenient dispatch of business requires an order of reference.

"A good commissioner is the right arm of the court, and his services are indispensable to the due administration of justice." *Hartman* v. *Evans*, 38 W. Va. 669, 677, 18 S. E. 810. .

■ "That the office of commissioner in chancery is one of the most important known in the administration of justice will be universally conceded. His duties are of a grave and responsible nature; he is the assistant to the chancellor. There is no question of law or equity, or of disputed fact, which he may not have to decide, or respecting which he may not be called upon to report his opinion to the court." *Bowers* v. *Bowers,* 29 Gratt. (70 Va.) 697, 700.

■ In *Kraker* v. *Shields,* 20 Gratt. (61 Va.) 377, 392, it is said:

"The question when it is proper, or may be useful, to resort

to the aid of a commissioner, is one which addresses itself to the sound discretion of the court, and as to which a large latitude of discretion must be allowed to the court; though of course the court ought to exercise such discretion soundly, *to prevent unnecessary expense or delay; which seem to be the chief, if not the only evils, of an improper reference.* The court is responsible for the correct decision of the cause, and cannot shift such responsibility from its own shoulders to those of a commissioner. But it can avail itself of the assistance of a commissioner to prepare the cause and place it in the best possible state to enable the court to decide it correctly. The most invaluable assistance may be afforded to the court by the agency of an intelligent, skilful, and experienced commissioner." (Italics supplied)

A good statement of the rule is found in 1 Hogg's Equity Procedure, sec. 619, p. 768:

"There are so many cases in which a reference to a commissioner is necessary, and the matter depends so much upon the facts and circumstances of each particular case, that no broad and inflexible rule can well be formulated to meet the various phases of equity practice, so often demanding the work of a commissioner that the ends of justice may be fully promoted. Perhaps as comprehensive a general rule as can be given here is that, whenever the cause involves the adjustment and settlement of accounts, the priority of right among lienholders, the more effectual working out of details which the judge sitting in court is unable to investigate, or to make some specific inquiry necessary to satisfy the conscience of the chancellor, there should be a reference of the cause to a commissioner."

In every suit for divorce two or more of the following questions are involved: (1) whether the court has jurisdiction and venue; (2) whether the marriage ties should be severed; (3) the amount of alimony to be paid the wronged consort; and (4) the award of the custody of infants, and the amount to be paid for their maintenance and support. A full inquiry on each question, and frequently on all, is necessary to satisfy the conscience of the chancellor in deciding correctly the issues involved.

The statutes (20-97, 20-99) create many differences between suits for divorce and other suits in equity. They provide (1) no person may maintain a suit for divorce unless one of the parties, at the beginning of the suit, is domiciled in, and is and has been an actual bona fide resident of the State for at least one year;

(2) only an authorized officer may serve notice or process; (3) the bill shall not be taken for confessed, nor a divorce granted on the uncorroborated testimony of the parties, or either of them, and (4) whether the defendant answers or not the cause shall be heard independently of the admissions of either party in the pleadings or otherwise.

Commenting on this declared public policy, it was said in *Bailey* v. *Bailey*, 21 Gratt. (62 Va.) 43, 50:

"All that was intended by the (statute) * * * was to put in the form of a statutory enactment, that principle which had been well settled by the ecclesiastical courts of England and the whole current of decisions of the courts of the States of the Union (where courts and not the legislature had jurisdiction of the subject of divorce) to wit, that a divorce would never be granted merely upon the consent, or on the default of the party charged, but only on proof of the cause alleged * * *. This salutary rule was intended to prevent parties who were weary of the bond of matrimony, and impatient of its restraints and obligations, from obtaining the aid of the court through their own collusion and default. It was a rule for the protection of public morals and the sanctity of the marriage relations. These were the paramount objects of the rule, and these were the paramount objects of the statute, enforcing a well settled rule of law."

The Commonwealth is an interested third party to every divorce suit, because the dissolution of a marriage is not solely the concern of the immediate parties thereto. In some jurisdictions the state or the public is actively represented by "a friend of the court" or "divorce counsel," whose duty it is to attend the hearing and advise the court, even in uncontested cases. Nelson on Divorce and Annulment, 2d ed. sec. 26.08, p. 63. There is no statute in Virginia authorizing the appointment of such an officer to advise the court in divorce suits. However, it is the duty of the court to see that the public policy of the State expressed in the statutes cited is not violated.

These marked distinctions between suits for divorce and other suits in equity were the inducing cause (and so stated in the report of the Judiciary Committee of the Virginia State Bar) for the adoption of the rule now under consideration.

It is stated in the briefs that 645 final decrees in divorce suits were entered in 1950 by two of the Norfolk city courts.

Deciding these cases and other cases on the docket imposed an unusually heavy burden upon the judges of these courts who are primarily responsible for keeping their dockets current. The rule was adopted not for the purpose of delegating their judicial functions to a commissioner in chancery, but to obtain his aid in the disposition of the business of the court. We know that in many suits for divorce much irrelevant evidence is introduced. To separate the relevant from the irrelevant mass of material presented to the court in such cases consumes an unreasonable length of time. The aid of an able, experienced and unbiased lawyer, acting as a commissioner in chancery, would relieve the court of much of this burden and materially assist it in the convenient dispatch of its business.[1]

A chancellor does not delegate his judicial functions to a commissioner in chancery when he refers a cause to him. In *Shipman* v. *Fletcher*, 91 Va. 473, 476, 22 S. E. 458, Judge Riely, speaking for the court, said:

"In a suit in equity, unlike in an action at law, matters of fact as well as questions of law are by the constitution and immemorial practice of the court determined and adjudicated by it. It is impracticable for the chancellor to investigate the matters of fact arising in a cause and take the testimony to that end; to state and settle the necessary accounts, which are often very complicated; to ascertain and classify the liens upon the property; and to perform other functions of a similar nature necessary to the proper adjudication of the matters of law and fact arising in the varied and important litigation, which pertains to its jurisdiction.

"Commissioners in chancery are appointed to assist the chancellor and to relieve him in a large measure of these and other duties incidental to the progress and determination of the cause. For this reason they have been aptly termed the 'arms of the court.' But from the very necessity of their appointment and the nature of their office, their work is subject to the review of the court. It may accept or reject it, in whole or in part, as its judgment, upon such review, may dictate, whether it be of law or fact. Commissioners are to assist the court, not to

---

[1]There is a difference of opinion among the authorities as to the propriety of referring issues in a divorce case to a commissioner in chancery. 3 Nelson on Divorce and Annulment, 2d ed. sec. 26.05, p. 56. This diversity of opinion is not pertinent in passing upon the power of the court to adopt a proper rule of practice.

supplant it. There is a wide difference between the trial and decision of a suit in equity and of an action at law. In the former, the court finds and decides upon both the facts and the law; while in the latter the jury are the triers of the facts, and the court expounds the law. There is no proper likeness between the report of a commissioner upon matters of fact, and the verdict of a jury. In an action at law, jurors are, under the law, the judges of the facts, and where the testimony is conflicting their verdict is conclusive. They are not in any sense the agents or assistants of a court of law, but perform within their appointed sphere a principal function of judicial trial. The court has a limited revisory power over their action, and may, within certain limits, set aside their verdict and award a new trial, but cannot find the facts. The facts are within the domain of the jury, and the court may not entrench upon it. But not so with the commissioners of a court of equity. They are its assistants, and their work is subject to the absolute review of the power they are appointed to assist. A court of equity cannot abdicate its authority or powers, nor confide nor surrender absolutely to anyone the performance of any of its judicial functions. It may rightfully avail itself of the eyes and arms of its assistants in the proper preparation for judicial determination of the many complicated, difficult, and intricate matters upon which its judgment is invoked, but in it resides the authority, and to it solely belongs the responsibility, to adjudicate them. In it remains the right to form its own conclusions from the results laid before it by its commissioners, and to pronounce its own judgments. Their entire work is subject to its review, consideration, and judgment, and it is in no wise precluded from doing so by their findings or conclusions.''

The 1919 Code revisors made the rule declared in the foregoing opinion a part of section 6179 of the 1919 Code (now 8-250) by adding the following sentence: ''The report of a commissioner in chancery shall not have the weight given to the verdict of a jury on conflicting evidence, but the court shall confirm or reject such report in whole or in part, according to the view which it entertains of the law and the evidence.''

When on a decree of reference the evidence consists of depositions of witnesses taken before a commissioner he has the advantage of noting the demeanor of the witnesses, their manner of testifying, which is important in judging of their

credibility, and is in a better position to weigh their testimony when they contradict each other. We held in *Roark* v. *Shelton,* 169 Va. 542, 545, 194 S. E. 681, and *Gilmer* v. *Brown,* 186 Va. 630, 642, 44 S. E. (2d) 16, that the practice is to accept the report of the commissioner as *prima facie* correct. When exceptions are filed to the report it is the duty of the court to examine the evidence and review the conclusions of the commissioner and determine for itself the correct decision to be made.

"These views of the office of a commissioner in chancery, and of the weight and effect to be given to his report, seem to us in accordance with right, and best calculated to attain the ends of justice; to be in accordance with the high and responsible duties of the chancellor, and with the special duties of the commissioner. They are also in accord with the decisions of courts of the highest respectability, and of the greatest weight and influence. *Shipman* v. *Fletcher, supra.*

The commissioner in this case returned the depositions with his report, but, without reference to the evidence upon which he based his conclusions, stated: "The charges of the complainant are supported by the evidence and your Commissioner recommends that the complainant be awarded a divorce *a mensa et thoro* * * *." A report in this form contains the mere opinion of the commissioner, and is not as helpful to the court as it would be if he had stated the facts. Therefore, the second paragraph of the rule should be amended to read as follows:

"All such suits, by appropriate decree, may be referred to one of the Commissioners in Chancery of this court to ascertain and report (1) the facts relative to whether the necessary grounds of jurisdiction and venue exist; (2) the facts relative to whether the divorce or annulment should be granted or refused, and (3) in like manner upon other matters raised by the pleadings and the evidence."

Defendant's final contention is there was no corroboration of complainant's testimony, and that the evidence was insufficient to support her charge of wilful desertion.

The parties were married March 9, 1949, in Norfolk, Virginia. Complainant was a widow, 31 years of age, who had a six-year old son by her former marriage to a soldier who was killed in World War II. She is paid $68 per month under the provisions of a policy of insurance on the life of her first hus-

band, and $20 per month for the son, which latter amount she will continue to draw until he is 18 years of age. Defendant was 28 years of age, and is a merchant seaman, licensed as master. After the marriage the parties lived in one of three apartments owned by defendant.

Apparently the parties lived happily together until November, 1949. Complainant's brother, Dr. B. A. Hubbard, Jr., performed an operation on her foot and advised her not to stand on or use it for several weeks. She testified that while she was so incapacitated her husband refused to wait on her, telling her that "he could not stand to be around sick people." His failure or refusal to give her proper attention during this incapacity forced her to go to the home of her parents. On cross-examination she admitted that she was asked to go to the home of her husband's parents where they could look after her. This she refused to do as her husand's mother was "an older woman," and she preferred to be with her own people. She remained with her mother until her foot healed, returned to their apartment and resumed marital relations with her husband.

The second difficulty arose on February 7, 1950. Complainant testified that her husband, in a fit of temper, ordered her to leave their home, which she did. A few days thereafter he asked forgiveness for the statements he had made in a fit of temper, and told her that he "felt like" she "had had a miserable life with him," and that he "owed" her "something," and asked her to return. She did not accede to defendant's request until April 15, 1950, and then not until he had bought a house at 410 Farrell street, Norfolk, for which he agreed to pay $6400, and had title conveyed to him and his wife as tenants by the entireties. Defendant paid $2400 on the purchase price of the property, built an additional bedroom for her son, and bought new furniture, the designs of which were selected by her and made to order. Defendant, with complainant's assistance, painted the house and screened the porch. Complainant also said that defendant had been giving her $75.00 a month to pay the household expenses, but in May and June he gave her only $30 and $18, respectively.

Her testimony on the question of desertion was: "I asked him on June 21 if he would give me some money to buy some food with, and he said he didn't have any. So, he left. I suppose he went to his people's." He made no other statement. At the time he left she did not know whether he was coming back.

Within the week he returned and removed from his home all of his clothes "except a couple of old uniforms." On July 1, complainant collected $65 from one of defendant's tenants. On July 7, without further communication with defendant, she instituted this suit for divorce.

Defendant's version of the difficulty between him and his wife is different from that of complainant. He testified that in 1949 and 1950 shipping from the Norfolk area was limited, and that on account of the fact that he did not belong to a seamen's union, it was difficult for him to obtain work at his trade. He worked when he could get it. In February, 1950, he was on a job which required him to work overtime, sometimes as many as 16 hours a day. On February 7, when he returned to his home "around 11.00 o'clock" a. m. (his wife testified it was around 8.00 a. m.) almost exhausted, he found his wife in her bathrobe, feeding her son. Upon reprimanding her for sleeping so late, a quarrel ensued. His description of the quarrel is: "Well, I was pretty upset then. Words began to fly. And I hadn't had no sleep and I guess I just—one of those things. I just flew off. One of the few times I ever did that. I didn't mean it, I wasn't sincere, never. I wasn't sincere about ordering her out of the house." Realizing that he had spoken too harshly to his wife, he went to her mother's home and told her he was sorry for what he had said, asked her forgiveness, and begged her to return with him to their home. She refused to live with him in his apartment, giving as a reason that the apartment was too near his people and she thought it was better for them to live some distance away.

Defendant, in order to satisfy his wife and induce her to live with him, bought the house at 410 Farrell street, which was near her best friend. On his wife's refusal to use the furniture he had in his apartment he bought new furniture for the home. On April 15, he, his wife and her son, moved into it. According to defendant's testimony, and the exhibits filed, these efforts to satisfy complainant caused him to spend approximately $3,000 within a period of two months.

Defendant was unable to find employment during April, May or June. On June 21st, on his return home for dinner, his wife told him "You are not getting any more of my food, any more of my food that I pay for," and ordered him to leave home. In obedience to her order, he left home and spent the night with his

father. The next day he and his father attended a funeral of his father's brother in the country and there remained for three days. On his return, he brought to his wife potatoes, Smithfield shoulder, and several dozen eggs. He denied he had ever refused to give his wife money to buy groceries. He said that when she asked him for money on June 21st he did not have any cash but that they had to their joint account in bank $19.11 which she could use. He testified that he had always been willing to support his wife. His exact language was: "I would give her my last penny. My last penny, I would give it to her. I would go without clothes to give it to her."

Defendant testified that he returned to his home on June 22nd and told his wife that he was going to attend his uncle's funeral with his father. He returned from the funeral on the 27th and again went to see his wife and asked her to let him stay at the home, to which she replied: "You are not going to be a boarder in this house. You are not going to stay here and board." About this time defendant obtained work on a ship as an ordinary seaman. He told his wife about this and took from his home only the clothes that he would need at sea. He did not tell her the name of the ship on which he was sailing or to what port it was bound because he did not then know.

Defendant sailed on July 5th and returned to Norfolk on August 6th. Before reaching Norfolk, in a telephone conversation with his father, he was told that his wife had instituted this suit for divorce. It was difficult for him to believe that his wife had taken any such action. On returning to Norfolk he immediately went to his home to discuss the matter with her. Upon reaching his home about 12:30 a. m., his knock on the door was unanswered, but he heard or saw his wife through a window. He called to her, but she refused to admit him. He told her that if she wanted to separate from him he could still live there and they could occupy different rooms. She refused to permit him to enter or live in his own home. She told him to talk to her lawyer or with his own. He then employed counsel to represent him in this cause.

Complainant testified that on August 6th, when her husband returned to their home late at night, she refused to admit him because she was afraid of him. She admitted that he had never threatened her or given her any grounds upon which to base her fears.

 The pertinent testimony of the parties consists of conflicting accounts of three quarrels between husband and wife. Considered separately or together, it reveals that neither party exercised that control of temper, patience and forbearance which it is the duty of one spouse to exercise toward the other in an effort to preserve the marital state.

''The law does not permit courts to sever marriage bonds and to break up households merely because husband and wife, through unruly tempers, lack of patience and uncongenial natures, live unhappily together. It requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations, rendering the association intolerable.'' *Butler* v. *Butler,* 145 Va. 85, 133 S. E. 756.

Complainant called her brother, defendant's father, sister, and defendant himself, as witnesses to corroborate her testimony. Neither complainant's brother nor defendant's sister knew anything about any difficulty between the parties, the circumstances leading up to the separation, or even that the parties had separated before the institution of the suit. The testimony of defendant's father is the only testimony tending in the slightest degree to corroborate complainant's testimony. The substance of his testimony was that defendant slept at his home from June 22nd (except for the three days he was in the country) until he went to sea. This witness did not know that the parties had separated or that they had had any serious difficulty. Such testimony does not constitute sufficient corroboration to meet the requirements of the statute (Code, sec. 20-99).

Complainant has failed to carry the burden of proving her charge of wilful desertion, without justification or excuse, by full and satisfactory evidence. *Phipps* v. *Phipps,* 167 Va. 190, 188 S. E. 168.

So much of the decree as awards complainant a divorce *a mensa et thoro* and $100 per month alimony is reversed and set aside; and the case is remanded with directions to dismiss it upon the payment of the sum of $150 allowed as a fee to attorney for complainant, and the payment of an additional reasonable fee, to be fixed by the lower court, as compensation to the attorney representing complainant in this court.

*Reversed and remanded.*

Eggleston and Whittle, JJ., concurring.

The opinion of the Chief Justice clearly demonstrates that the rule promulgated by the lower court with respect to references in divorce suits is sound in principle and proper in form. Having reached this conclusion, we see no occasion for holding that it should be modified and restricted.