COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Elder and Senior Judge Cole
Argued at Salem, Virginia


NANCY LEE KELKER
                                        OPINION BY
v.    Record No. 1734-99-3         JUDGE MARVIN F. COLE
                                     DECEMBER 19, 2000
JOHN WARREN SCHMIDT


          FROM THE CIRCUIT COURT OF GRAYSON COUNTY
                    Duane E. Mink, Judge

          Dennis P. Brumberg (Brumberg, Mackey & Wall,
          P.L.C., on briefs), for appellant.

          Alan K. Caudell (Caudell & Bedsaul, on
          brief), for appellee.


     Appellant, Nancy Lee Kelker ("wife"), contends the trial

court committed reversible error in disregarding the

recommendations of the commissioner in chancery regarding

alleged marital debts.  For the reasons that follow, we affirm

the trial court.

                          BACKGROUND

     The parties married on October 6, 1988.  The trial court

granted wife a divorce from appellee, John Warren Schmidt

("husband"), on December 30, 1996, but retained jurisdiction

over issues of spousal support and equitable distribution.  On

August 25, 1997, the chancellor referred the case to a

commissioner in chancery to determine, inter alia, the "marital

and non-marital debts of the parties and who is legally obligated upon such debts and in what proportions."

On June 30, 1998, the commissioner conducted an evidentiary hearing. The second page of Exhibit 3 listed "Personal Property (remaining to be divided)." Part (c) of the personal property listing contained the following entry:

```
(c)  Wife's indebtedness for bills
        Up to 1993           $11,000.00
        1993 to 1995          28,500.00
                             $39,500.00
```

Wife testified that between 1988 and 1993, she borrowed $11,000 from Dr. Nancy Troike for "[l]iving expenses." Wife averred that, in 1993, she received approximately $100,000 for services she rendered relating to "the San Saba painting case," which began in 1981. Wife said she repaid the $11,000 loan "[f]rom the moiety money that [she] finally received for the San Saba painting."

Wife claimed that husband made no contribution toward repaying this $11,000 debt and added that "[h]e didn't feel I should repay it at all." Wife also testified that she borrowed an additional $28,500 from Troike between 1993 and 1995 "for living expenses and for expenses to try to start a small catalog business." According to wife, $4,000 was used to purchase a computer for the business. After the first year, the catalog business lost $1,000. Wife said that some of the borrowed funds

were used "[f]or various expenses that were needed . . . to maintain the house and property" and to "buy groceries, [and] pay electric."  Wife claims the money is still owed and that husband never paid or offered to help pay any portion of the $28,500 debt.  Wife testified that she and husband had a joint account "for a period of time and then [they] had separate accounts."

When asked on cross-examination whether there was a "promissory note" for the $11,000 loan from Dr. Troike, wife replied, "There is a letter where she verifies the borrowing it, but, no, there's not a note."  The letter was not produced. Wife acknowledged that she did not sign anything for the loan. When asked if there were any documents on which "you would post the payments on the bottom," wife responded, "No.  That's not the way you have to do business in Texas."  The following exchange took place:

> Q:  And does that go for the larger amount
> that you borrowed later, the twenty-eight
> thousand (28,000.00)?
>
> A:  Yeah.  She [Dr. Troike] would send me
> checks as I needed them.  It wasn't
> twenty-eight thousand ($28,000.00) all at
> one time.
>
> Q:  O.K.  Is it true that the eleven
> thousand dollars ($11,000.00) you testified
> to was borrowed and repaid without Mr.
> Schmidt's knowledge?
>
> A:  No.  He knew I was repaying it.

Q:  Did he know you were borrowing it?

A:  Yes.  Because he had been with me when I picked up her checks at the mail box and on one time he made a comment about it being my monthly allowance.

Husband testified at the June 1998 hearing that he learned about the wife's claim of an $11,000 loan from Dr. Troike "a little over a year ago when we received copies of . . . our tax returns from [wife's] previous attorney."  Husband testified that he was never aware of the $28,500 loan.  In explaining why he was not aware of the debts, husband stated, "I didn't have access to what she did with her money.  That was her business."

In his report, the commissioner explained:

> [Wife] testified that there were a number of debts incurred by her for marital purposes to which [husband] has made no contribution. She testified that she borrowed money on several occasions from Nancy Troike. Between 1988 and 1993 she borrowed Eleven Thousand ($11,000) Dollars.  Later, between 1993 and 1995 [wife] borrowed an additional Twenty Eight Thousand ($28,000) Dollars from Ms. Troike.  All of this, except for Four Thousand ($4,000.00) Dollars used in the catalogue business, she testified were for household expenses such as maintaining the house, groceries, and to pay the electric bill.  There is no evidence that [husband] offered to pay the money back.  These marital debts would be in the total amount of Forty Thousand Five Hundred Twenty ($40,520) from which it appears that [husband] benefited equally and should be responsible for ½ or Twenty Thousand, Two Hundred Sixty ($20,260.00) Dollars.

In recommending an award, the commissioner apportioned husband's "portion of the marital debt which totals Forty Thousand, Five Hundred Twenty-Two ($40,522) Dollars, 1/2 of which is Twenty Thousand, Two Hundred and Sixty ($20,260) Dollars."

Excepting to the commissioner's report, husband contended the commissioner erred in determining the marital debts. Husband asserted that the "debts were not bona fide, were not sufficiently verified or proven, and . . . were not existing debts of the parties."

By letter opinion dated May 3, 1999, the trial court sustained husband's exception. Explaining that it was "incumbent upon the party requesting apportionment [of marital debt] to prove by a preponderance of the evidence the amount of outstanding debts for which apportionment is requested," the trial court explained:

> Of course, it is up to the Commissioner to judge the credibility of the witnesses, however, there is no corroboration at all to [wife's] testimony that she had borrowed $28,000.00 from Dr. Troike over a three year period. She indicated there were letters requesting money, but that they would be in Dr. Troike's possession. There are no promissory notes, deposit slips indicating deposit of funds from Dr. Troike to individual or joint accounts of the parties to this proceeding.

The trial court also noted that wife admitted that in 1993 she received a large amount of money from the "San Saba case," perhaps as much as $100,000, thus calling into question her need to incur marital debts by borrowing money for household expenses. Accordingly, the trial court sustained husband's exceptions to the commissioner's report.

DISCUSSION

Code § 20-107.3(E) authorizes the court to make an "apportionment of marital debts." Furthermore,

> Code § 20-107.3(E)(7) provides that the debts of each spouse shall be considered as a factor when determining how to distribute jointly owned marital property or to fashion a monetary award. The purpose and nature of the debt, and for and by whom any funds were used, should be considered in deciding whether and how to credit or allot debt.

Gamer v. Gamer, 16 Va. App. 335, 341, 429 S.E.2d 618, 623 (1993).

In cases involving the equitable distribution of property, "'[t]he burden is always on the parties to present sufficient evidence to provide the basis on which a proper determination can be made.'" Bowers v. Bowers, 4 Va. App. 610, 617, 359 S.E.2d 546, 550 (1987) (quoting Hodges v. Hodges, 2 Va. App. 508, 517, 347 S.E.2d 134, 139 (1986)).

The Supreme Court has defined the authority of a commissioner in chancery in an equity proceeding as "an officer

appointed by the chancellor to aid him [or her] in the proper and expeditious performance of his [or her] duties."  Raiford v. Raiford, 193 Va. 221, 226, 68 S.E.2d 888, 891 (1952); see also Haase v. Haase, 20 Va. App. 671, 678-79, 460 S.E.2d 585, 588 (1995).  When a trial court refers a cause to a commissioner in chancery, it does not delegate its judicial functions to the commissioner in chancery.  Lawrence v. Lawrence, 212 Va. 44, 47, 181 S.E.2d 640, 643 (1971).

In Haase, we said:

> the commissioner, while functioning as an
> independent judicial officer, is a surrogate
> for the chancellor and is subject to the
> chancellor's control.  Conversely, the
> actions of the commissioner are not binding
> on the chancellor, who must exercise
> independent judicial judgment over the
> evidence presented in the commissioner's
> report.  Once adopted by the chancellor,
> however, the actions, findings and
> recommendations of the commissioner become
> those of the supervising court and are due
> considerable deference on appeal.

20 Va. App. at 679, 460 S.E.2d at 588 (citing Brawand v. Brawand, 1 Va. App. 305, 308, 338 S.E.2d 651, 652 (1986)).

> "While the report of a commissioner in
> chancery does not carry the weight of a
> jury's verdict, Code § 8.01-610, it should
> be sustained unless the trial court
> concludes that the commissioner's findings
> are not supported by the evidence.  This
> rule applies with particular force to a
> commissioner's findings of fact based upon
> evidence taken in his presence . . . .
> [W]here the chancellor has disapproved the
> commissioner's findings, this Court must

review the evidence and ascertain whether, under the correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the trial court. Even where the commissioner's findings of fact have been disapproved, an appellate court must give due regard to the commissioner's ability, not shared by the chancellor, to see, hear, and evaluate the witnesses at first hand."

Jones v. Jones, 26 Va. App. 689, 694, 496 S.E.2d 150, 153 (1998) (quoting Hill v. Hill, 227 Va. 569, 576-77, 318 S.E.2d 292, 296-97 (1984)).

In Jones, the trial court referred certain matters, including issues of custody and attorney's fees, to a commissioner in chancery. In his report, the commissioner recommended, inter alia, "that the parties have joint legal and physical custody of the children and [he] detailed precisely how the physical custody was to occur. He also recommended that husband pay $2,500 of wife's attorney's fees." Id. at 693, 496 S.E.2d at 152. The "[h]usband filed exceptions to the custody and attorney's fee recommendations, and both were sustained without comment by the trial court." Id. Specifically, the trial court "granted husband primary physical custody of the children with 'liberal visitation' to wife" and "reduced the attorney's fees to be paid by husband from $2,500 to $1,000." Id. We found "nothing in th[e] record showing the trial court found insufficient evidence to support the commissioner's

recommendation" regarding joint custody.  Id. at 695, 496 S.E.2d at 153.  Concluding from "our review of the record that the trial court, for reasons not disclosed, simply preferred to make a different ruling" and "made no finding that the commissioner's report was unsupported by the evidence," we reversed and remanded the issues of custody and attorney's fees.  Id. (emphases added).

Here, unlike the situation in Jones, the trial court made detailed findings regarding the quality and quantity of evidence about the alleged loans from Dr. Troike.  Specifically, the trial court noted the lack of any documentation regarding two purported substantial loans to wife.  Also, having found that wife could have earned as much as $100,000 in 1993, the trial court was skeptical of wife's claim that she obtained the personal loans to pay household expenses.  Moreover, wife provided no evidence to support her oral assertions that she borrowed money from Dr. Troike and that such funds were used to pay household expenses; she offered no statements, receipts, or checks.  Furthermore, the record contains no evidence of specific household debts that wife claimed she paid with the borrowed money, nor did she prove such expenditures by way of cancelled checks, receipts or invoices.  Without proof that the debts were marital and that the money was, in fact, used to pay marital debts or expenses, the trial judge was not required to

accept the commissioner's unexplained finding that the alleged loans were marital debts. The chancellor clearly stated that it was incumbent upon the party requesting apportionment to establish by a preponderance of the evidence the amount of outstanding debts for which apportionment is requested, and appellant failed to do so.

In contrast to the specific findings made by the trial court, the commissioner failed to state why he decided to credit the claimed loans from Dr. Troike to wife as marital debts and to apportion them equally to both parties. Although "we give due regard to the commissioner's findings on those subjects that particularly depend on the commissioner's ability to see, hear, and evaluate the testimony of the witnesses," Clark v. Scott, 258 Va. 296, 302, 520 S.E.2d 366, 369 (1999), the commissioner did not describe anything he heard or saw in the evidence or proceedings that would show he was in a better position to evaluate the evidence than the trial judge, who had a written record of the entire proceedings.

We find that in equitable distribution cases when the trial judge reviews a decision on the basis of witness credibility, it should be evident from the record how the trial judge resolved the witness credibility issues consistent with the commissioner's observations. When the commissioner's findings are based, in whole or in part, upon the witness' appearance and

demeanor at the hearing, the trial judge may have difficulty reviewing that finding without recalling the witness. On the other hand, if the commissioner's determination is based on the substance of the testimony and not upon the witness' demeanor and appearance, such a finding is as determinable by the trial judge as by the commissioner. Only when the commissioner's finding is specifically based upon what the commissioner saw and heard is the commissioner in a better position than the trial judge to make factual findings on that basis. Therefore, we hold the commissioner in equitable distribution cases must expressly state in his or her report what he or she saw and heard concerning witness' demeanor and appearance if the decision is based, in whole or in part, upon witness demeanor and appearance. If the commissioner's report is based upon substance only, the trial judge is as competent as the commissioner to decide the facts. The trial judge is unable to give "due regards" to the commissioner's factual findings that depend on the commissioner's ability to see, hear and evaluate the testimony of the witnesses unless the commissioner describes such observations in his or her report.[1] This procedure will add

---

[1] For background material involving the deference that the Workers' Compensation Commission must accord certain determinations by deputy commissioners, see Bullion Hollow Enters., Inc. v. Lane, 14 Va. App. 725, 729, 418 S.E.2d 904, 907 (1992), in which we examined and discussed the holding in Goodyear Tire & Rubber Co. v. Pierce, 5 Va. App. 374, 382, 363

uniformity in the numerous equitable distribution cases that come before us.

Here, the commissioner in chancery arrived at a conclusion without explaining the basis for that conclusion. Although wife documented in detail her efforts at increasing the value of the marital residence, submitted an invoice from an accountant relating to a tax audit, and submitted a detailed list with valuations of the inventory of PS Antiques, she failed to submit any documentary evidence to prove by a preponderance of the evidence the existence of and purpose for the alleged loans from Dr. Troike.

CONCLUSION

Our review of the record reveals no evidence of the loans or specific recorded observation by the commissioner in chancery

---

S.E.2d 433, 437 (1987), appeal after remand, 9 Va. App. 120, 384 S.E.2d 333 (1989), regarding the deference accorded express credibility observations made by a deputy commissioner. In Pierce, we looked at "[t]raditional principles [involving credibility determinations] . . . both in the civil and criminal law." Id. at 381, 363 S.E.2d at 437.

In Bullion Hollow, we held that the Workers' Compensation Commission may disregard a deputy commissioner's express credibility determination when it "articulates its reasons" for doing so. 14 Va. App. at 729, 418 S.E.2d at 907. Thus, "when [a] deputy commissioner makes an explicit finding of credibility based upon a witness' demeanor or appearance at the hearing, the commission may reverse that factual finding when it articulates a basis for its different conclusion that is supported by credible evidence." Id. Conversely, absent an express credibility determination by the deputy commissioner, "the commission ha[s] no duty to explain its reasons." Id. at 729, 418 S.E.2d at 906.

concerning any witness' demeanor or appearance; instead, the record contains mere conclusions by the commissioner that the loans were made and that they were marital debts.  On the other hand, the trial court set forth specific reasons for disapproving the commissioner's determination of marital debts.

In summary, we hold that, under the correct application of the law, the evidence supports the findings of the chancellor. Therefore, we affirm the findings of the trial court.

<u>Affirmed.</u>