## Richmond

Amy Orme Green v. Austin Bernard Green.

April 28, 1958.

Record No. 4785.

Present, All the Justices.

The opinion states the case.

*Jerrold G. Weinberg* (*Louis B. Fine,* on brief), for the appellant.

*Joseph E. Baker* (*M. R. Broudy,* on brief), for the appellee.

WHITTLE, J., delivered the opinion of the court.

On June 2, 1955, Amy Orme Green filed her bill in the Court of Law and Chancery of the City of Norfolk against Dr. Austin Bernard Green, praying for a divorce *a mensa et thoro*. The bill alleged cruelty and desertion, and prayed that complainant be awarded custody of their infant daughter, together with alimony and support money for the child's maintenance and education, reasonable attorney's fees and court costs. Respondent in his answer denied the charges and prayed that the bill be dismissed.

On May 31, 1956, the court referred the matter to a commissioner in chancery who heard the evidence and filed his report.

On June 3, 1957, the court entered a final decree affirming the commissioner's report which awarded complainant custody of the daughter, together with money for her support and maintenance. In accordance with the report, the decree also allowed attorney's fees and court costs, but denied complainant a divorce and alimony as prayed for. From this decree Mrs. Green appealed.

Complainant assigns three errors which pose the question: Did the court err in refusing to grant complainant a divorce and alimony in accordance with the prayer of the bill?

The record discloses that the parties were married on November 28, 1934. Their only child, Suzanne, was born June 18, 1939. The record is replete with evidence showing that in recent years the married life of the parties had been turbulent, with conditions growing from bad to worse. The parties had separated once before, in 1950. Mrs. Green testified that upon reconciliation she found it necessary to work in order to pay for her clothes and other expenses as she was unable to get money from her husband, that he refused to give her a definite allowance. She stated that she had worked at various and sundry places while living with her husband and, since the separation, at the time of her deposition, she was employed as a school teacher at a salary of $2800 per year.

Much of the record is taken up with the charge as to Dr. Green's failure to properly support his wife and daughter while they were living together. This is denied by him. He justified his position in not being more liberal by saying that although he had practiced medicine in Norfolk for twenty years or more, in recent years his health had not permitted him to actively engage in his profession, and his income therefrom had been limited.

Mrs. Green alleged and sought to prove that her husband, for several years prior to the institution of the suit for divorce, had been extremely abusive, being subject to frequent outbursts of temper; that he used profane language toward her when angry, at which times there would be arguments; that she would try to soothe him and prevent the arguments, and at times would seek seclusion in other parts of the house.

In this connection, complainant was corroborated by witness Viola Gummer who worked for the parties about fourteen years as housekeeper. She said that although Mrs. Green had been a good wife to the respondent "he didn't treat her any kind of fashion at all"; that Dr. Green would curse and raise his voice at his wife while he was arguing with her, and that "every time it was his fault". She was further corroborated by the testimony of her daughter, Suzanne, who stated that her father "would start arguing and start fussing over the least little thing"; that there were frequent arguments, and when her father would start these arguments her mother would "try to get along with him."

This was denied by Dr. Green who, without corroboration, sought to place the onus for the arguments on his wife.

This situation culminated in violence on the night of May 27, 1955. Complainant testified that on this occasion Dr. Green was late coming home for dinner which she had prepared. When he came in, a violent argument started over the meal. Mrs. Green testified that "he told me I didn't have to tell him what he wanted to eat, that it was his damn house and he would eat what he wanted to, that all I had to do was to put it there. I said 'Don't get so excited. There is nothing to be excited over.' He said 'Don't tell me what to do. I will do what I damn please,' and then he started." She was asked, "Did you reply to him?", to which she answered:

"No more than to try to quiet him down because at that time Suzanne was beginning to get excited. She [Suzanne] said 'Please keep quiet and let's eat dinner', and he continued to talk and I said, 'All right,' and I got up to go in the kitchen because there is no point in sitting there arguing. When I made a move to get up he got up and rushed at me. He was cursing, and I was at the end of the room and he caught me and threw me off balance and that is when I fell on the chair and that is when he hit me in the face and broke my glasses and started beating on me on the head and in an attempt to get up I lost balance again and fell back again. He began shaking me

and beating me again in the tussle. That left me weak and when I finally managed to get up and get out of the dining room he still hadn't turned me loose, and I had called to Suzanne to call the police, and she had tried to hit him on the back to get him to turn me loose. She finished calling the police and he said, 'You have just got to go, you have got to go, that is all there is to it.' I tried to reason with him and I couldn't, and Suzanne spoke up and said, 'If mother is going I am going, too.' He proceeded to shove us out of the door and said 'go'."

The daughter fully corroborated her mother as to the assault. She said that when her mother fell backward her father grabbed her around the arms and shoulders "and he kept hitting her and had her head up against the window sill and the edge of the radiator." Suzanne further stated that when he ordered her mother to leave she told him she was going with her, and respondent replied, "Both of you get out," and "he pushed us out the door and slammed the door."

The record discloses that when the officers arrived the door was locked. Dr. Green was arrested, later tried in the police court and fined for the assault upon his wife.

A picture exhibit taken four days after the assault shows that the wife had been severely beaten and bruised. Dr. Green's explanation of what happened was that his wife started the argument and he slapped her with his open hand.

Dr. Boyd, a physician and surgeon and a friend of both parties, testified that he was called to treat Mrs. Green on the night of the assault; that when he saw her "she was very excited, nervous, and she had contusions on her face and arms, and a hematoma on her head."

Reverend John C. Diamond, a friend of the family, saw Mrs. Green on the night of the assault and said that she appeared to be very much upset and her face seemed to be swelling. He said that her husband's explanation of the injuries he inflicted upon his wife was "Out of impatience I smacked her"; and that he stated he was "very angry" when he "smacked" her.

[1] The trial judge, in his written opinion, stated:

"However, the commissioner who heard the testimony and had the opportunity to observe the parties found:

"(1) That the assault committed upon the complainant by the defendant was not so severe and atrocious as to endanger her life.

"(2) That the evidence does not indicate that the defendant in-

tended to do the complainant serious bodily harm or cause her to have reasonable apprehension of serious danger in the future.

"(3) That the attendant circumstances do not show that the acts of the defendant were likely to be repeated.

"The conclusions of the commissioner, when the evidence is taken in his presence, should be sustained unless it appears that they are contrary to law, are unsupported or unwarranted by any reasonable view of the evidence."

In *Raiford* v. *Raiford*, 193 Va. 221, 228, 229, 230, 68 S. E. 2d 888, 893, 894, where we had under consideration the approval of a rule of procedure relating to the reference of certain questions arising in divorce cases to commissioners in chancery for the purpose of taking proof and reporting findings to the chancellor, we approved and attempted to clarify the rule, circumscribing its application. There we held that there were marked distinctions between suits for divorce and other suits in chancery regarding the reference to commissioners. A chancellor does not delegate his judicial functions to a commissioner in chancery when he refers a cause to him; in the final analysis it is the duty of the chancellor to review the evidence and arrive at his own conclusions. Commissioners are appointed for the purpose of assisting the chancellor and not for the purpose of supplanting him.

The chancellor in this instance, in affirming the report of the commissioner, relied largely on our holding in the case of *DeMott* v. *DeMott*, 198 Va. 22, 28, 92 S. E. 2d 342, 346, wherein we said:

"It is generally held that a single act of physical cruelty does not constitute ground for divorce, unless it is so severe and atrocious as to endanger life, or unless the act indicates an intention to do serious bodily harm or causes reasonable apprehension of serious danger in the future, or the precedent or attendant circumstances show that the acts are likely to be repeated."

We adhere to this pronouncement but the facts and circumstances in the instant case and those in the *DeMott* case are distinguishable. There was only one act of cruelty alleged in the *DeMott* case while in the instant case the assault appears to have been the culmination of a long series of cruel treatments in which the husband, over a period of years, was guilty of reprehensible conduct toward his wife. In the *DeMott* case the testimony of the wife was uncorroborated while here the wife's testimony is amply corroborated both as to the husband's treatment of her prior to the assault and as to the assault itself.

After the assault in the *DeMott* case the wife remained in the home for a period of five days. In the instant case the wife was forced from the home by her husband, leaving immediately after securing her belongings, and there has been no suggestion on his part that she return. She was physically ejected by the husband and told to "go". Here the allegations of the bill are not based upon the charge of a single act of cruelty but upon acts other than the act of physical violence, all of which are fully corroborated. *Hensley* v. *Hensley*, 198 Va. 414, 94 S. E. 2d 211.

For the reasons stated the decree of the trial court is reversed and the case remanded with directions that the court enter a decree granting the wife a divorce *a mensa et thoro* as prayed for, at which time the chancellor should allow such alimony as he thinks proper, if any, under the existing circumstances. A fee of $300.00 is here allowed the attorneys for appellant for their services on this appeal.

*Reversed and remanded with directions.*