# Richmond

ROBERT J. SOLLIE v. PATRICIA ANN HUGHES SOLLIE.

June 12, 1961.

Record No. 5236.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*Harvey S. Lutins* (*T. W. Messick*, on brief), for the appellant.

*G. W. Reed, Jr.*, for the appellee.

BUCHAHAN, J., delivered the opinion of the court.

On May 1, 1957, Patricia Ann Hughes Sollie, complainant, filed her bill against her husband, Robert J. Sollie, defendant, seeking a divorce *a mensa et thoro* on the ground of cruelty, and praying for the custody of their daughter, Elizabeth Ann, then six years old, and for alimony for herself and support for the child. The defendant filed an answer and cross-bill, in which he prayed for a divorce *a mensa et thoro* from the complainant on the ground of desertion, with permission to have the same merged into an absolute divorce at the proper time.

Evidence was taken, some by depositions and some *ore tenus*, at intervals over a period of more than two years, on the basis of which the court entered its decree on May 5, 1960, dismissing the defendant's cross-bill and granting to the complainant a divorce *a mensa et thoro*, awarding the custody of the child to the complainant, together with alimony to her and an allowance for the support of the child. On the same day, on petition of the complainant, the decree was merged into a decree of divorce *a vinculo matrimonii*, with the same provisions for alimony and support until the further decree of the court.

The defendant says the sole issue involved in this appeal is whether the court erred in granting a divorce to the complainant and in dismissing the defendant's cross-bill. His argument is that there was not sufficient corroboration of the complainant's evidence to warrant the decree.

The parties were married in February, 1951, in Maryland where the defendant was going to school. He was then twenty-three years old and she was twenty. After the marriage she lived with her mother in Pittsburgh until the following June, when the defendant finished school. They then moved to Schenectady, New York, where the defendant had a job with General Electric and where their child was afterwards born. Her mother went with them. They lived there four years, then in 1955 they moved to Roanoke county where they had bought a home and he continued his employment with the Electric Company.

There seems to have been little harmony or happiness in the marriage; rather the evidence presents a record of almost continuous discord, running the scale of disagreements, jealousies, arguments, coarse language and physical combat. She testified that from the first their marriage was not a partnership, "He went out and I sat

at home." She claimed that during their entire married life he hardly had a kind word for her or paid her a compliment or praised anything she did. While they were living in Schenectady he could not find his hunting knife and slapped her because she wouldn't find it for him. He had slapped her and struck her, she said, on several other occasions while they lived there. On one occasion when her mother was present he threw water from the fish bowl at her when they had an argument over a girl. One of his names for her which he frequently used in the presence of their friends, she said, was "maggot mouth," and he would tell them that he picked her up off the street; that she was illegitimate and was nothing until he got her.

On March 1, 1957, after she and the defendant had been having trouble, they went together to see her attorney and get his help. She said her husband was not interested and when they returned home he accused her of lying to the attorney. In the ensuing argument and while she was holding the baby, he sat down across her lap, slapped her across the face and around her ears and then began beating her on the leg. When she got away from him she went to a neighbor's and called the sheriff but was told she would have to swear out a warrant before any arrest could be made. She returned home and stayed there until April 16, 1957, when she left, taking the daughter with her, and went to live with her mother. She said she left as soon as her mother had a place for her to live, as she had no job and no money.

During the time they were living together in Roanoke county she developed a facial paralysis, called Bell's palsy, which she attributed to her nervous condition induced by her marital troubles. Her mother, testifying in February, 1958, said, "look at her how her face is twisted * * she had a beautiful face. She can't smile now; she can't talk right."

The complainant testified that the defendant never showed the love for the daughter that a father should, and she described specific acts of cruelty in his punishment of the child. Her mother corroborated her in this respect. One of her neighbors, who admitted that she was partial to Mr. Sollie, testified that his punishment of the child "did not fit the crime" and she thought at one time he seemed to enjoy punishing her, but she later concluded that she was wrong about that.

The complainant's mother testified that in October, 1956, nearly

a year after they moved to Virginia, she telephoned the defendant and asked him if she could come down and he requested that she do so. She was with them until after the occurrence of March 1, 1957. She did not see that affair but testified that after the defendant had gone to work that morning her daughter came out of her room and her face was black and blue. The mother inquired, "What hit you?" and the daughter replied, "The master." Her testimony in general corroborated that of her daughter as to the quarrels, troubles and mode of life of this couple, and the attitude and behavior of the husband to his wife and child. Of the defendant she said, "There's nobody any nicer than Bob when he wants to be nice, but there's nobody more spiteful when he wants to be."

She testified that her daughter wanted to live with her husband but that she definitely was afraid of him, and cited instances in support of her statement. She would not assert, she said, that the trouble was all the defendant's fault, but that she would not have taken what her daughter had had to take during the seven years of their marriage. She was asked if it appeared to her that the defendant was about to kill the complainant, and her reply was, "Well, you can kill people without striking them. You can torture them to death."

It is evident from the testimony that this mother was not a person of notable refinement, but was given at times to the use of coarse language and to the drinking of beer and perhaps other spirits, but her testimony was impressive in its apparent frankness and the trial court could readily have given it credence. It is clear that she gave financial aid to the couple through the years, and while the defendant in his testimony claimed she was the cause of much of the trouble, he admitted that he never asked her to leave and testified that he got along quite well with her. There is some indication of affection between them although at the conclusion of her testimony she said of him and to him that he was "a born liar."

The neighbors who were called as witnesses both by the complainant and by the defendant expressed their preference for the defendant and said that he was no more to blame for their arguments than she was, and that there was name-calling on both sides. Their testimony was that when the complainant came to the home of one of them after the trouble on March 1 she showed no physical marks of injury but that she was then screaming and crying and saying that

Bob was coming after her. They corroborated some of her testimony as to his ugly references to her in their presence.

The defendant testified at great length and to the effect that while he was not blameless in their troubles, the fault was more hers than his. He cited instances of her failing in her duties as his wife. He admitted that they frequently quarreled and had violent arguments, but said that he had struck her only on two occasions. One was the hunting knife episode in 1953, when he gave her "a little love tap, you might say, on the side of the face," after she "gave me a knee in the groin." He said she had a habit, even at play, of hitting him in groin, and added, "Where she picked this up at, I don't know . . ." The other occasion was the incident of March 1, 1957, when he said they had a heated argument and she started calling him dirty names and kicked him in the groin. He grabbed her and "just gave her a love tap; a fingertip motion on the side of the face or the mouth."

He said they got along better after she had the facial paralysis because she realized it was unsightly and that she then had to win people on personality. In response to a question as to why he stayed on if he was abused so badly as he claimed, he replied, "People have been stepping on me all my life" and "I have been abused all my life and accepted it."

After the depositions in the case had been concluded the trial court held two *ore tenus* hearings. The first was on April 19, 1960, when both the complainant and the defendant testified as to the possibility of reconciliation. The complainant testified that she had talked to her husband on the telephone about a week before and asked for a reconciliation but he had said no, absolutely not. The defendant testified "There couldn't be any reconciliation; every time we talk to each other, we argue, and it's not necessarily her fault. But we still argue. I can't see how there could be talk of reconciliation." At the end of this hearing the court announced its conclusion that the complainant was entitled to a divorce on the ground of cruelty and constructive desertion, and directed that a decree be prepared accordingly.

Afterwards, on May 5, 1960, the second *ore tenus* hearing was held. At its beginning the court stated that the defendant had complained that he had not had an opportunity to make certain statements or put on certain evidence that he had, and for that reason he did not think justice had been done; that the court had advised the defendant to

talk to his attorney and if after doing so he felt he had some additional evidence an opportunity would be given him to present it.

The defendant then took the stand and offered in evidence portions of tape recordings, made without the knowledge of his wife, of telephone conversations alleged to have occurred between the defendant and her, one on January 26, 1958, and another on March 25, 1960. The court refused to hear the tape recordings but permitted the defendant to testify from his notes as to what these conversations were. Their substance was that his wife had said to him that the cause of their separation was her mother and religion and not the defendant; that she admitted she was wrong in a lot of things, and that she had made a mess out of his life and Betty's life. He told her, he said, that he would have been a lot better if she hadn't done those things; that "I wasn't perfect; but I thought I was better than the next guy, as far as a husband is concerned."

He was asked by the court why he didn't refer to the tape recordings when he took his evidence on June 12 and 16, 1959, or at the *ore tenus* hearing on April 19. He replied that he did not realize they were evidence; that he told his attorney he had them but his attorney said, "I can't believe that stuff." In response to questions from the court about a reconciliation his answers were revealing. He said he thought there was a possibility, but when the court inquired why there had been no reconciliation he answered, "Well, I've got the home there, and I'm there; and I did nothing wrong, as far as her leaving me, I feel—or in wanting her leave me. * * The house is there, and I didn't cause her to leave; and she can come back just the way it was when she left."

The court then asked him if he had not told the court at the April 19 hearing that he would like to become reconciled but knew in his heart that he shouldn't. He replied, "No; I think I said my heart told me to reconcile, but my mind told me my heart couldn't take it."

We have said in our decisions in this field that angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, may as effectually endanger life or health as personal violence, and afford grounds of relief to the injured spouse, *Latham* v. *Latham*, 71 Va. (30 Gratt.) 307, 321; and that cruelty is cumulative, admitting of degrees and augmented by additions, so that it may be condoned and even forgiven for a time, and up to a certain point, without any bar to bringing it all forward

when a continuance of it has rendered it no longer condonable. *Owens* v. *Owens*, 96 Va. 191, 195, 31 S. E. 72, 74; *Ringgold* v. *Ringgold*, 128 Va. 485, 497, 104 S. E. 836, 841.

In this case the wife and the husband appeared and testified before the trial court on at least two occasions, giving the court an opportunity to appraise their testimony and evaluate it in the light of their appearance, their manner of testifying and the reasonableness of what they said. The court gave the parties full opportunity to develop the case. After reading the depositions "carefully and more than once," as the court said, and seeing and hearing the parties, it reached the conclusion that the complainant was entitled to prevail and to have the relief granted by the decree appealed from. The evidence was sufficient and there was sufficient corroboration of the complainant's testimony, Code § 20-99, to support and warrant the conclusion reached by the court.

For a discussion of what constitutes sufficient corroboration, as well as of the presumption of the correctness of a decree based on depositions, see the opinion of Mr. Justice Spratley in *Martin* v. *Martin*, decided today, *ante*. p. 769. The presumption of correctness is materially strengthened here by the fact that the immediate parties also testified in the presence of the court.

As additional errors the defendant assigned the refusal of the court to hear the tape recordings and to call the child as a witness at the hearing on May 5, 1960. As to the first, enough has been said above to show that there was no error in this ruling. The court allowed the defendant to testify fully from his notes as to the alleged conversations with his wife. An annotation on the admissibility of sound recordings in evidence may be found in 58 A.L.R. 2d at 1024.

With respect to the second assignment, the motion was that the court examine the child "as to any statements made by Mrs. Sollie * * that it was not her husband's fault, but that she left because of her mother and religion." The court replied that it saw no reason to put the child on "unless you have some pertinent evidence." No evidence was offered and there was no avowal of what the child would say. There was no error in this ruling.

In response to the complainant's petition in her brief, a fee of $250.00 is allowed to her counsel for representing her in this court.

The decree appealed from is

*Affirmed.*