## 𝔖taunton

Ruth Gort Wimbrow v. Vernon A. Wimbrow.

September 8, 1967.

Record No. 6464.

Present, Eggleston, C.J., and Spratley, Buchanan, Snead, Carrico and Gordon, JJ.

*Henry M. Schwan* for appellant.

*Daniel Hartnett; R. Norris Bloxom* (*C. Lester Drummond*, on brief), for appellee.

Gordon, J., delivered the opinion of the court.

Ruth Gort Wimbrow brought this suit against her husband asking for divorce from bed and board because of his cruelty and because of his constructive desertion on July 7, 1965. The husband, Vernon A. Wimbrow, filed a cross-bill asking for a divorce from bed and

board because of her desertion on that day. After hearing the evidence in open court, the trial judge awarded the husband a divorce. The wife appeals.

The parties were married in 1939. Mr. Wimbrow said they "got along all right" until 1942, when Mrs. Wimbrow accused him on two occasions of improper relations with his brother's widow. After those incidents, the domestic situation grew progressively worse. Mr. Wimbrow said that thereafter he had "never loved . . . [his] wife", in fact "had no respect for her".

Mr. Wimbrow complains of Mrs. Wimbrow's jealousy and her accusations about his improper relations with other women. He admitted that "except when she would make these accusations [about other women], I have no complaint of her as a wife and mother. She kept the house properly, but she is insanely jealous, and it was always something. If I got blood on my handkerchief from blowing my nose, she would insist it was lipstick".

Mrs. Wimbrow's daughter by a previous marriage (Audrey Wiston) said that during her visit in the home from mid-June to July 4, 1965, Mr. Wimbrow rarely spoke to Mrs. Wimbrow, did not have meals with her, and habitually left home alone around 10:00 o'clock at night, returning around 5:00 the next morning. Mr. and Mrs. Wimbrow's daughter (Orchid Wimbrow) and Mrs. Wimbrow's granddaughter (Blossom Thompson) said that they had observed similar conduct when they were visiting in the home during the last several years before the separation. Mr. Wimbrow did not contradict the testimony of these witnesses about his conduct.

The events of the early morning of July 7, 1965 are crucial to our decision because they prompted Mrs. Wimbrow to leave home. Before describing those events, however, we will relate a previously unmentioned subject of controversy that Mr. Wimbrow pointed to as justifying his actions on July 7.

Mr. Wimbrow complained that his wife took his money. He said: "If you put money down, she would pick it up. If you had two fifty dollar bills, she took one of them. You couldn't hide a pocketbook from her. I have left it in the safe at the office, and not carried it home. I would count the money in my wallet, and tell her, you took a hundred dollars out of my pocket." He said further "I had told her a few years ago that if she ever took money from me again, she would remember it for a long time".

Mr. Wimbrow returned home in the early morning of July 7,

1965 and went to bed. Later he got up and went to the bathroom. Mrs. Wimbrow, who was in another bed in the same room, then got up and removed his wallet from its hiding-place under the mattress of his bed. She said "[w]hile I was looking at his wallet, he came in, crashed his fist in my face, threw me on the bed, and picked up a dressing table bench, and beat me unmercifully".

Mr. Wimbrow testified that he slapped Mrs. Wimbrow. "[S]he had money in her hands, and the pocketbook, and I told her to leave it alone, and I slapped her, and told her to leave the room, and she wouldn't do it, and I slapped her several times. She dropped what money she had taken, and told me to leave." He refused and "went back to bed".

Mr. Wimbrow's testimony that he only slapped his wife is incredible in view of the other uncontradicted evidence. A doctor saw Mrs. Wimbrow on July 9, 1965. He found "hematomas and abrasions of the left upper arm * * * and the upper portion of the left thigh". The hematomas were "of susbtantial size". When the doctor was asked "would it require a hard blow on the areas of the arm and leg [to cause the injuries] you have described" he answered "It would have to be a pretty good blow".

A picture of Mrs. Wimbrow taken in mid-July 1965 shows severe bruises of the left arm and thigh. At the time of the trial, about five months after the beating, there was still "a discolored mark on her [left] arm", about two inches wide and two inches long, and a discolored mark on her left thigh of undisclosed dimensions.

Both parties alleged that Mrs. Wimbrow left home on July 7, 1965. She said she left on July 7 because she was afraid, and would have left earlier in the day except for car trouble that required her to rent a car. Mr. Wimbrow said she left home the "following morning", the "8th [of July]". He was probably mistaken about the date, but in any event he is bound by his allegation that she left on July 7. Their testimony that they had been continuously separated through the trial of this case in December 1965 was corroborated.

The question raised by the events of July 7 is whether Mrs. Wimbrow was justified in leaving home on that day. Counsel for Mr. Wimbrow contends that she was not justified in leaving, even though she was beaten, because she provoked the beating.

[1] "[O]ne spouse is not justified in leaving the other, unless the conduct of the other is sufficient to establish the foundation of judicial proceeding for a divorce." *Lawyer* v. *Lawyer*, 207 Va. 260, 264,

148 S.E. 2d 816, 819 (1966). We find that the actions of Mr. Wimbrow described above, culminating in the beating of Mrs. Wimbrow on July 7, 1965, constituted cruelty, a ground for divorce in Virginia. See *Green* v. *Green*, 199 Va. 927, 103 S.E.2d 202 (1958). Mrs. Wimbrow was therefore justified in leaving home and is entitled to a divorce unless Mr. Wimbrow can successfully defend on the ground that she provoked the beating on July 7, 1965 or that her actions before that day should bar the granting of a divorce to her.

"The general rule is that a divorce will not be granted on the ground of physical cruelty when the acts of cruelty complained of were provoked by the misconduct of the complaining spouse. However, that there was some provocation will not disentitle a spouse to relief if the retaliatory cruelty complained of was out of proportion to the provoking conduct." *Godwin* v. *Godwin*, 245 S.C. 370, 376, 140 S.E.2d 593, 596 (1965).

Mr. Wimbrow testified that Mrs. Wimbrow had taken his money on occasions before July 7, 1965, and that he had warned her "she would remember it for a long time" if she took money from him again. So we recognize that Mrs. Wimbrow knew or should have known that she would provoke action by Mr. Wimbrow if he should surprise her taking money from his wallet.

While admitting that Mrs. Wimbrow's taking money from her husband's wallet on July 7 was an act of provocation, we find that his retaliatory conduct, in beating her brutally, was out of proportion to her provoking act. We hold therefore that Mrs. Wimbrow's provoking act did not disentitle her to a divorce.

Counsel for Mr. Wimbrow relies upon *Toler* v. *Toler*, 168 Va. 302, 191 S.E. 638 (1937) and *Butler* v. *Butler*, 145 Va. 85, 133 S.E. 756 (1926), to support his contentions that Mrs. Wimbrow's provoking act on July 7, 1965 disentitled her to relief. Those cases, however, do not control the decision of this case. Not only were the wives' provoking acts in those cases more aggravated, but the husbands' retaliatory acts were much less severe than Mr. Wimbrow's actions.

[2] We conclude also that the brutal beating on July 7, 1965 gave Mrs. Wimbrow reason to fear further bodily harm if she continued to live in the home. This was not the first time Mr. Wimbrow had beaten or threatened Mrs. Wimbrow. Their daughter Orchid, who was twenty-five when she testified, said that when she was thirteen or fourteen: " . . . I saw him [Mr. Wimbrow] strike her

[Mrs. Wimbrow]. He pushed her on the bed and hit her with his left hand. He hit her several times with his right. I was screaming at him to stop." Orchid said "And also I have seen bruises from other beatings that [*sic*] I wasn't there." She did witness this incident: "[T]hey [Mr. and Mrs. Wimbrow] had an argument, and he grabbed a shotgun. * * * Threatened to kill her and himself. She begged him to stop." Mr. Wimbrow did not contradict this testimony given by Orchid. Moreover, the beating on July 7, 1965 revived Mrs. Wimbrow's right to complain of previous beatings, which she had condoned by continuing to live with her husband. See *McKee* v. *McKee*, 206 Va. 527, 145 S.E.2d 163 (1965).

[3] We hold that Mrs. Wimbrow was justified in leaving home on July 7 and is entitled to a divorce unless her actions before that day constituted sufficient grounds for awarding a divorce to Mr. Wimbrow. If her actions constituted sufficient grounds, the rule of recrimination would bar the granting of a divorce to her.

As grounds for granting a divorce to him, Mr. Wimbrow relies upon Mrs. Wimbrow's jealously and her accusations about his improper relations with other women. Twice in 1942 Mrs. Wimbrow accused Mr. Wimbrow, in the presence of his brother's widow and other persons, of improper relations with his brother's widow. Mr. Wimbrow admitted that he slapped Mrs. Wimbrow on the second occasion.

In 1954 Mrs. Wimbrow accused him, in his secretary's presence, "of having an affair" with his secretary. Mr. Wimbrow said he ordered Mrs. Wimbrow out of the office and, when she did not leave, he slapped her. At Mr. Wimbrow's insistence, Mrs. Wimbrow apologized to his secretary. (The secretary testified that Mrs. Wimbrow apologized, but the secretary's aunt, who was present, said that Mrs. Wimbrow also repeated the accusation.) The secretary testified that shortly thereafter Mrs. Wimbrow "came to the office, and ran me [the secretary] out again". Mr. Wimbrow testified "[s]he [Mrs. Wimbrow] still continues to this day to accuse me of having an affair with . . . [my secretary]", and that Mrs. Wimbrow has accused him "of going with any woman whose home I played bridge in . . . [identifying three women], and any number of other women". He denied the truth of her accusations.

However, Mr. Wimbrow did not deny the testimony, which we have recited, that he habitually left home alone around 10:00 o'clock at night, returning around 5:00 the next morning, during the last

several years before the separation. Nor did he contradict other damaging testimony, some of which will be outlined in the next two paragraphs.

Mrs. Wimbrow testified that she found other women's lipstick on Mr. Wimbrow's clothing. Their daughter Orchid and Mrs. Wimbrow's daughter Audrey Wiston corroborated Mrs. Wimbrow's evidence. Orchid said "I have seen lipstick on his clothes, but I didn't see how it got there. * * * It had a bluish cast that none of us [the family] wear".

Audrey Wiston testified about Mr. Wimbrow's remarks to her in 1962: "He told me that he went out with other women, and if they wouldn't go to bed with him by the fourth time he took them out —went out with them—he never went to see them again, and I was very very shocked".

We cannot sustain a finding that Mrs. Wimbrow's jealousy and accusations amounted to cruelty. In view of Mr. Wimbrow's conduct, as shown by the uncontradicted evidence, Mrs. Wimbrow had reason to suspect her husband of improper relations with other women.

As we have pointed out Mr. Wimbrow testified that he had no complaint of Mrs. Wimbrow as a wife and mother except for her jealousy and accusations of infidelity. Nevertheless we will deal with other incidents referred to in the statement of facts contained in the brief filed by his counsel.

The brief recites that Mrs. Wimbrow "reported her husband to the Internal Revenue Service for tax matters which resulted in her husband suffering audits for prior years". But Mr. Wimbrow testified only that Mrs. Wimbrow had said she would report him to the Internal Revenue Service for "cheating" on his income tax and that he heard her call the Internal Revenue Office in Norfolk at 6:00 o'clock one morning. He admitted that he did not hear what she said, and that he did not know whether a subsequent audit by the Service was prompted by her call.

The brief recites that Mrs. Wimbrow "spitefully refused to sign deeds of trust . . . [the signing of which was necessary] in order to facilitate the performance of her husband's business". But the evidence shows that she signed certain deeds of trust, and she gave reasons for refusing to sign others. Furthermore, when Mr. Wimbrow was questioned about her failure to sign a deed of trust to enable him to purchase certain property, he said "[n]either the pur-

chase of that or no [sic] other land was an absolute necessity".

Finally, the brief recites that "using outrageous language, the complainant [Mrs. Wimbrow] on learning that her husband's father might marry a relative of a certain Nan Byrd informed the latter that her husband would not be responsible for the support of either party to this marriage".

The incidents outlined in the preceding three paragraphs, singularly and in the aggregate, do not prove cruelty on Mrs. Wimbrow's part. Counsel failed to prove what Mrs. Wimbrow said when she called the Internal Revenue Service or that Mr. Wimbrow suffered an audit because of Mrs. Wimbrow's call. He failed to prove that she "spitefully" refused to sign deeds of trust. Mrs. Wimbrow's conversation with Nan Byrd, even if improper, does not prove cruelty to her husband.

Although we are reluctant to set aside findings made by a trial judge upon evidence heard in open court, we must do so on the record before us. The decree is therefore reversed and the cause remanded with direction to grant Ruth Gort Wimbrow a divorce from bed and board from her husband, Vernon A. Wimbrow, on the ground of cruelty. °

[4] In connection with Mrs. Wimbrow's request for alimony, the court should admit in evidence a financial statement dated August 26, 1964, which Mr. Wimbrow gave to a bank, reflecting a net worth of approximately $277,000. Mrs. Wimbrow's counsel proffered this statement, but upon objection that the statement was privileged the trial judge refused to admit it as evidence. Mr. Wimbrow's counsel now concedes that the statement was not privileged, but says it was not pertinent evidence of Mr. Wimbrow's current financial condition. The admission of the statement will not imply that it reflects Mr. Wimbrow's present net worth. But since he testified in this suit that his current net worth was approximately $20,000, Mrs. Wimbrow's counsel should be permitted to ask him what disposition he has made of the assets listed in the financial statement.

*Reversed and remanded.*