## Richmond

WILLIAM H. GRAHAM v. INEZ S. GRAHAM.

March 9, 1970.

Record No. 7108.

Present, All the Justices.

*Harry P. Anderson, Jr. (Satterfield, Haw, Anderson, Parkerson & Beazley, on brief), for appellant.*

*Archer L. Yeatts, III (Bareford and Downs, on brief), for appellee.*

HARRISON, J., delivered the opinion of the court.

William H. Graham, plaintiff, filed a bill against his wife, Inez S. Graham, defendant, seeking a divorce *a mensa et thoro* to be later merged into an absolute divorce on the ground of willful desertion.

Defendant filed an answer and cross-bill, in which she prayed for a divorce *a mensa et thoro* on the ground of cruelty and constructive desertion with permission to merge into an absolute divorce at the proper time.

The evidence was taken by depositions, and the chancellor entered a final decree on May 14, 1968, denying each party a divorce for the reason that their respective allegations had not been proven. Plaintiff excepted to the action of the trial court, and we granted him an appeal. Cross error was not assigned by the defendant.

The evidence of plaintiff established that on October 20, 1967, while he was visiting his mother in Pulaski, defendant removed herself, and the furniture in five rooms of their home, located at 4905 Gilmur Road in Henrico County. Corroboration was provided by neighbors of the parties and by their pastor. They either helped defendant pack or were advised by her that she was leaving and moving to 321 Appian Avenue, Virginia Beach. At the time Mrs. Graham seemed under considerable strain and reflected anxiety. The act of the defendant in leaving was willful and constituted an actual breaking off of the matrimonial cohabitation by her with the intent to desert.

The chancellor concluded that, while plaintiff established that his wife left on October 20, 1967, he failed to corroborate "that this was without justification or excuse". In effect, the trial court held that in order for plaintiff to secure a divorce on the ground of desertion, it is necessary that willful desertion be established and that he prove that such was without justification or excuse.

This proposition finds support in *Owens* v. *Owens*, 197 Va. 681, 684, 90 S. E. 2d 776, 778 (1956), which contains language to the effect that: "A decree of absolute divorce should not be granted unless the evidence relied upon proves wilful desertion without justification or excuse, and the burden of establishing this rests on the complainant. [Citing numerous cases.]"

We do not construe these cases as requiring a plaintiff to establish desertion by a defendant, and also to negate every ground or reason which such defendant might have for deserting. To so hold

would require a plaintiff to prove that the defendant was not entitled to a divorce on any of the grounds recognized by law—this in addition to proving his primary ground for affirmative relief.

In the instant case plaintiff alleged desertion by defendant and also alleged that such desertion was "without justification or cause". The latter allegation was unnecessary, for Code § 20-95 provides that "[a] divorce from bed and board may be decreed for . . . abandonment or desertion". In the absence of justification, apparent from plaintiff's own admissions, proof by plaintiff of an actual breaking off of matrimonial cohabitation, combined with the intent to desert in the mind of the offender, entitles the party deserted to a divorce. When such desertion is established, the duty of going forward with evidence of justification and excuse then rests on defendant, unless such justification appears from testimony adduced by plaintiff.

The chancellor further concluded that the testimony of defendant disclosed conduct on the part of plaintiff which, if corroborated, would entitle her to a divorce. He denied her the divorce for lack of such corroboration, and properly so, for the only evidence of corroboration came from her spouse, the plaintiff.

█ We are therefore confronted with a narrow issue of fact: Are the admissions of plaintiff alone, or taken with the evidence of defendant, sufficient to show legal justification for her desertion of him? In making this determination, it is proper that we consider his admissions. While no divorce may be granted on the uncorroborated testimony of the parties or either of them, and the cause shall be heard independently of the admissions of either party (Code § 20-99), such testimony and admissions are admissible and competent as evidence to defeat a prayer for divorce. *Cralle* v. *Cralle*, 79 Va. 182 (1884); *Bailey* v. *Bailey*, 62 Va. (21 Gratt.) 43 (1871); *Tillis* v. *Tillis*, 55 W. Va. 198, 46 S. E. 926 (1904), 6 Mich. Jur., Divorce and Alimony, § 31, p. 294.

These parties were married July 9, 1955 in Pulaski. At the time of their separation Mr. Graham was 43 and Mrs. Graham was 54. No children were born of the marriage. Mrs. Graham has two children by a prior marriage.

Plaintiff is employed in the daytime by the Virginia State Health Department as an Embalming Supervisor and works nights and Saturdays as a salesman in the electrical department of Sears Roebuck and Company.

The witnesses, other than the parties, established that Mrs. Graham

moved out of the home on October 20, 1967 and went to Virginia Beach. Mrs. Helen Chapman had seen Mrs. Graham when she was upset and crying because of some argument with plaintiff, but she had never seen him hit, curse or abuse his wife. The Reverend Earle E. Henley, Jr. had been consulted by Mrs. Graham regarding her marital problems 12 to 15 times over a period of two years. He had consulted with the parties separately and together. On one occasion he noted "definitely a bruise" on Mrs. Graham's upper arm and said she was nervous and upset. Mrs. Joyce E. Hydrick also saw a bruise on defendant's arm about a year and a half prior to the separation, and at one time she saw a bruise above defendant's knee.

Mr. Graham left for Pulaski to visit his mother on the afternoon of Thursday, October 19, 1967, and upon returning the following Monday night, he found the house empty of furniture and furnishings, except for his bedroom suite, a TV set and some miscellaneous articles. He determined from defendant's daughter-in-law that his wife had moved out and where she had gone, but did not telephone defendant, for he "saw no reason for her leaving". Plaintiff stated that he loved his wife and would have tried to contact her "if there hadn't been so much water under the dam before". He said that his wife had threatened to leave a number of times because "she wasn't happy with me".

Plaintiff admitted to having "right much of a temper at times"; to getting "right angry"; and in a fit of anger to breaking some furniture, a chair or two, and kicking a cabinet door loose, but "[n]ot in the last year or two". He also said that he had cursed his wife, used vile words to her, such as calling her a "bitch", "son-of-a-bitch" and "liar", and a few times had stayed out all night "because we had fussed and I went out".

Graham also admitted slapping his wife on the arm about two years prior to their separation, giving her "right much of a bruise", and hitting her one time later when they were in the car. Apparently the incident in the car happened the latter part of March, 1967.

He said that everytime they had a fuss, "[I]t's from prodding and calling me a liar, and not just once but sometimes from the time I walk in the door to eat supper, or when I come back from work if I am working at Sears, and up until 2:00 and 3:00 o'clock in the morning"; and that sometimes the fussing would go on for days, starting out as mild nagging and getting to the place where each would curse the other. Graham agreed that nagging by a wife did

not justify cursing or hitting her: "Actually nothing justifies calling anybody that. It shouldn't be done from anybody. I agree with that. It's the release that many of us have."

Testimony given by the defendant shows that her relationship with plaintiff's family was not a close and friendly one. Defendant did not feel accepted by her mother-in-law and complained of being treated like an outsider. She recalled an occasion which involved an unwilling visit with her in-laws, because her husband said: "[I]f you think you live in hell now, if you don't go with me, I will show what living in hell is really like." Taking that to be a threat, she went with him because "I had gotten to the point where I was afraid of him".

The desertion on October 20, 1967 related to a visit plaintiff made his family. Mrs. Graham testified that plaintiff's mother had written a month and a half prior to the time. Defendant read the letter and resented plaintiff saying nothing to her about the proposed visit. On October 18th she phoned plaintiff at his office and learned that he was going to Pulaski the following day. She asked what he expected her to do, and he responded: "I don't give a damn what you do. I am going to be with my mother so I can laugh and enjoy myself, and I don't care what you do."

Defendant stated that plaintiff came in that night around 8:30, walked straight to his bedroom, took his clothes off and went to bed without turning the light on. When she went in the room and turned the light on, he said: "[C]ut that damn light off, and I did. And I said, going to bed so early? He said yes, I am tired. And I said why are you so tired? He said I have been out blanking a dozen women." Mrs. Graham then left the room and slept in one of the other bedrooms that night.

Plaintiff asked defendant to accompany him to Pulaski. She gave as a reason for not going: "I felt that I was not accepted and that I was in the way, and after he had talked to me the way he did on the phone, plus the way he came in that night, I just felt like I could not go with him."

Her explanation for moving out the following day was: "[A]fter what he told me on the 12th of May—That if I thought I lived in hell now, if I did not go with him that he would show me what living in hell was really like. I was afraid if I stayed there, I did not know what he would do to me when he came back, and I felt that my health

was at a low ebb and that I was not physically or mentally able to stand any more."

The testimony of defendant with reference to plaintiff's temper, the abusive language that he used and the times that he struck her, was stronger but essentially the same as that given by plaintiff on cross-examination. She admitted cursing plaintiff on one occasion. When asked why she was afraid of plaintiff, Mrs. Graham testified:

"Well, his vicious temper and his drinking, and the way I was not allowed to open my mouth, and in the past five years he gradually got to where we had no communication whatsoever, and every time I would try to talk with him about our marriage or about debts, he would go into tantrums and he would curse me and call me all kinds of horrible names and tell me how he hated me. And also, that he was going to have me put in Williamsburg." (apparently referring to Eastern State Hospital)

Defendant says that plaintiff drank to excess, and when asked if her husband appeared to have been drinking after staying out all night, she said:

"He would usually be drunk when he left or either he would be mad during the day and would not come home at all at night, and he would always leave calling me a God damn son-of-a-bitch, and he would come in the next morning, when I would open the door for him he would look at me and call me that again."

No other witness testified to plaintiff's drinking except Mr. Henley who said he "may have" smelled whiskey on plaintiff's breath one time.

A great portion of defendant's testimony concerned her efforts to have plaintiff consult with a marriage counselor. Defendant discussed her marital problems with her pastor, a marriage counselor, a representative of Alcoholics Anonymous and also a psychiatrist. She said that plaintiff would not talk about their marriage. Her testimony was:

"I would try to get him to talk with me about our marriage, and I would say Bill, I know there is something wrong. Let's lay the cards on the table. Let's get it straight. I want to know where I stand and what the trouble is. And he would go into a rage and

fit and clench his fists and, well, get red in the face and even the foam would run out of his mouth and he would say you God damn sorry son-of-a-bitch, I can't have any peace in my own home and you are the sorriest low-down woman that a man could have for a wife."

Mrs. Graham's version of plaintiff's actions when angry and the episodes in which furniture was destroyed, was as follows:

"He came in and he was late coming in, and I asked him about his being late, and he went into a tantrum and he kicked off every door of every cabinet in the kitchen, picked one up and beat it over the edge of the cabinet as hard as he could, possibly did it for five minutes, I know. . . . At another time he kicked a hole through one of the bedroom doors. At another time he kicked a hole in one of the bedroom walls. . . . Twice he ran his fist through the wall in the hall. And one time he was drinking, he came in and he wanted me to go out with him and I said no, and he picked up one of the lamps and he said if you are not ready to go with me in five minutes, this lamp is going right through that mirror."

■ It is manifest that for a period of time the marriage of these parties had been deteriorating, and they had been drifting apart. The disparity in ages, the strained relationship between defendant and plaintiff's family, financial difficulties, and differences in temperament could be contributing causes. In any event, there seems to have been little harmony or happiness. There was almost continuous discord, jealousy, arguments, coarse and abusive language, violent outbursts of temper and two physical assaults.

It appears that as the plaintiff became more indifferent, and as his interest in their marriage waned, the defendant became more persistent in trying to persuade Mr. Graham to "talk about their marriage" and consult a marriage counselor. Her efforts were not only fruitless but were resented by plaintiff and regarded by him as "nagging". This is understandable if plaintiff was no longer interested in preserving the marriage. However objectionable her campaign may have been to plaintiff, we cannot condemn this wife for desiring to preserve the marriage or for wanting to seek professional help.

Defendant justifies her desertion of plaintiff on the ground of cruelty, testifying that she had reached the point where she was afraid

of him and "was not physically or mentally able to stand any more".

The physical assaults on Mrs. Graham were admitted by her husband, and some corroboration was provided by other witnesses. The bruises inflicted in one of the assaults were serious enough, in the opinion of defendant, to warrant medical attention, for she consulted her physician, Dr. Homer Ferguson.

Defendant also points to the vile and abusive language used to and about her by plaintiff, his temper tantrums and the destruction of articles of furniture. These acts are admitted by him.

In addition, defendant testified that plaintiff drank to excess, threatened her life, threatened to have her put in a mental institution and evidenced repeatedly his hatred for her and his indifference.

Plaintiff, when called in rebuttal, was not questioned regarding any evidence given by his wife and therefore neither denied nor admitted her testimony.

In *Butler* v. *Butler*, 145 Va. 85, 88, 133 S. E. 756, 757 (1926), we said:

"The law does not permit courts to sever marriage bonds and to break up households merely because husband and wife, through unruly tempers, lack of patience and uncongenial natures, live unhappily together. It requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations, rendering the association intolerable."

See also *Raiford* v. *Raiford*, 193 Va. 221, 68 S. E. 2d 888 (1952) and *Stolfi* v. *Stolfi*, 203 Va. 696, 126 S. E. 2d 923 (1962).

A divorce cannot be granted merely because a husband and wife are unable to live together in peace and harmony. *Upchurch* v. *Upchurch*, 194 Va. 990, 76 S. E. 2d 170 (1957).

However, in *Sollie* v. *Sollie*, 202 Va. 855, 860, 861, 120 S. E. 2d 281, 285 (1961), involving cruelty as a ground for divorce, we observed:

"We have said in our decisions in this field that angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, may as effectually endanger

life or health as personal violence, and afford grounds of relief to the injured spouse, *Latham* v. *Latham*, 71 Va. (30 Gratt.) 307, 321; and that cruelty is cumulative, admitting of degrees and augmented by additions, so that it may be condoned and even forgiven for a time, and up to a certain point, without any bar to bringing it all forward when a continuance of it has rendered it no longer condonable. *Owens* v. *Owens*, 96 Va. 191, 195, 31 S. E. 72, 74; *Ringgold* v. *Ringgold*, 128 Va. 485, 497, 104 S. E. 836, 841."

A fair reading of the evidence leads one to the conclusion that the attitude, approach and conduct of Mrs. Graham may have contributed in some measure to the marital difficulties these parties experienced. However, the retaliatory acts of Mr. Graham were out of proportion to her provoking conduct. See *Wimbrow* v. *Wimbrow*, 208 Va. 141, 156 S. E. 2d 598 (1967) quoting from *Godwin* v. *Godwin*, 245 S. C. 370, 376, 140 S. E. 2d 593, 596 (1965).

It is apparent there has been no collusion between the parties here. The evidence as a whole, and the circumstances related, give confidence in the truth of the statements made by defendant. Corroboration of her testimony comes largely from the admissions and testimony of plaintiff.

The misconduct of plaintiff was serious. The cursing, the abuse, the violent outbursts of temper, the physical assaults, the destruction of furniture and his indifference constituted conduct subversive of the family relations. These acts occurred, continued and apparently were forgiven for a time. They finally accumulated to the point where Mrs. Graham feared for her life, and was no longer physically or mentally able to stand more. Her association with the plaintiff had been rendered intolerable.

To grant plaintiff a divorce we would have to find that Mrs. Graham deserted her husband without justification and thereby forfeited her right to all maintenance or support from him. We cannot so find from the record before us.

Our conclusion is that neither party is entitled to a divorce upon the evidence adduced before the trial court. The testimony established justification for defendant's desertion of plaintiff, and he will therefore not be decreed a divorce. Absent the admissions and corroboration supplied by her husband, the evidence is not sufficient to entitle defendant to affirmative relief and a divorce from her husband on the ground of cruelty.

The observation made by Mr. Justice Eggleston in *De Mott* v. *De Mott*, 198 Va. 22, 28, 29, 92 S. E. 2d 342, 346 (1956) is pertinent here:

"While the record shows a deplorable marital situation, that does not warrant the granting of a divorce upon insufficient evidence. As we observed of a similar situation in *Phipps* v. *Phipps*, 167 Va. 190, 191, 188 S. E. 168, 169, 'If the parties were divorced, the ends of society would perhaps be better served, but the courts cannot make cases for the parties or supply the necessary elements even to attain a worthy purpose.'"

This case gives support to the action of the General Assembly of Virginia in providing in Code § 20-91 that a divorce may be decreed on the application of either party if and when the husband and wife have lived separate and apart without any cohabitation and without interruption for two years.

In view of the status of the record before us, we do not reach, and therefore express no opinion on, the matter of alimony or the correctness of the amount allowed defendant by the trial court in its final decree.

The effect of our decision is to deny a divorce to the plaintiff and is the same conclusion reached by the trial court.

*Affirmed.*