## Richmond

Marian Ruth Johnson v. Clarence Edwin Johnson.

September 1, 1972.

Record No. 7845.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Harman, JJ.

*Filmore E. Rose (Stanley E. Sacks; Sacks, Sacks & Tavss*, on brief), for appellant.

*John D. Gray (Carmel, Gray & Hogge, on brief), for appellee.*

HARRISON, J., delivered the opinion of the court.

Marian Ruth Johnson, plaintiff, filed a bill against her husband, Clarence Edwin Johnson, defendant, seeking a divorce from him on the ground of cruelty. Defendant filed his answer and a cross-bill praying for a divorce from her on the ground of desertion.

Evidence was taken by depositions before a Commissioner in Chancery, who reported that defendant should be granted a divorce *a mensa et thoro* from plaintiff upon the ground of willful desertion. Plaintiff's exceptions to the report were overruled. A decree was entered by the lower court, on March 29, 1971, granting defendant a divorce *a mensa et thoro* from plaintiff on the ground that plaintiff was "guilty of willful desertion and abandonment of the defendant culminating on or about February 25, 1970". On the same day defendant was granted an absolute divorce from plaintiff on the ground of desertion. Plaintiff appeals the action of the lower court in granting the divorce decrees to defendant, denying the relief prayed for in her bill and refusing to award her alimony.

We are confronted here with issues of fact to be examined in light of Code § 20-99 which provides that no divorce may be granted on the uncorroborated testimony of the parties or either of them. Mr. and Mrs. Johnson, both age 57, were married in Maryland in 1933. Of the four children born to this couple, two survived and are over the age of 21 years, as is an adopted child. Defendant has been City Manager of Hampton for a period of more than 15 years and the parties resided in that city.

Plaintiff testified about an improper relationship that she suspected the defendant had with a woman some 18 years prior to her suit for divorce, and at a time when the parties were living in Annapolis, Maryland. She also testified that about the same time defendant on one occasion beat her so badly that she had to go to the dispensary at the U. S. Naval Academy. Defendant denied any improper conduct in Maryland, and denied that he beat plaintiff. He admitted that he "may have slapped her". The parties continued to live together and several of their children were born thereafter.

A further specific incident detailed in the evidence occurred on November 19, 1969. It appears that a dinner and theatre party was given at the Wedgewood Theatre to which the officials of Hampton

were invited. Plaintiff testified that when defendant left to go to the theatre he told her he would be home about 10 P. M., adding "you know there is going to be a little delay". Plaintiff said that when her husband got home it was 1:10 A. M. and she had the door locked. She opened the door, let him in and said: "You go back in the other bedroom and stay there until you decide I am your wife and decide to treat me as your wife".

Defendant's version is that he told his wife he would be home about 11 P.M. but that he was delayed by reason of having to take the assistant City Manager and some other people home. He testified that Mrs. Johnson was waiting for him when he came in, was very excited and called him "all types of names". He said that he did not explain why he was late because she was too excited to have listened. The following day she moved his clothes out of the main bedroom that they had previously shared and from that time they did not live together as husband and wife.

The next and principal episode relied on by plaintiff to prove cruelty occurred on January 28, 1970. The occasion was "men's night" at the Hampton Roads Coliseum. The festivities involved the city officials, including the City Manager, and continued from late afternoon throughout the evening. Defendant arrived home about 2 A. M. In the meantime the Mayor of Hampton, Mrs. Kilgore, had telephoned the Johnson residence to talk with the City Manager. Mrs. Johnson advised that defendant was at the Coliseum. Plaintiff was told by the Mayor that her husband, Mr. Kilgore, who also had been to the Coliseum, had gotten home. She requested Mrs. Johnson to have defendant call her as soon as he came in. It appears that Mrs. Kilgore and Mrs. Johnson talked together two or three times during the evening, and that plaintiff made several calls in a futile effort to locate defendant. When he did come in she told him to "sit down in a chair and talk to me". She said he replied, "I am not a little boy". At that time plaintiff went to the phone to dial Mayor Kilgore. Mrs. Johnson testified that defendant grabbed the receiver out of her hand and hit her left hand with it. It was then she smelled his breath and said "you have been drinking" and slapped him on the side of his face with her open palm. She said that defendant "pulled back and let me have it on the left jaw and I fell back on the dining room chair. My glasses fell on the dining room table and if I hadn't held onto the chair I would have hit the dining room wall. He hit me with such force, I flew".

Defendant testified that the lateness of his arrival home was due to his official duties as one of the hosts. He denied being drunk, saying that between 5 in the afternoon and 2 the following morning, he had 8 or 9 drinks at the most. He said he was tired for he had been up that day since 7 A. M. His version of what occurred is that as soon as he entered the house, his wife began cursing him with filthy language and ordered him to sit down; that she told him Mayor Kilgore had been trying to reach him; that she picked up the telephone receiver and started to dial, saying she was going to call the Mayor; that defendant took the receiver from her and told her that she was not going to call anyone at that time of night; that when she put the receiver back on the hook she accused him of having been drinking and slapped him across the face; that when she started to strike him again he put his hand up and at that time unintentionally hit her in the face and knocked her glasses off; and that then she seemed to stumble back over a chair. He said that after this incident his wife continued to storm about the house cursing and screaming until she became very hoarse.

Plaintiff introduced testimony which involved defendant and a young girl of Japanese origin, Mrs. Canterbury, who, together with her husband, lived across the street from the Johnsons. The Johnsons and the Canterburys were at one time on friendly and neighborly terms. However, Mrs. Johnson suspected that the relationship between her husband and Mrs. Canterbury was of a more intimate character and she accused him of having an improper interest in the girl. She testified that on one occasion, when Mrs. Canterbury and another friend, Mrs. Ruth R. Mingee, were having dinner with the Johnsons, and they were sitting at the dining room table, her husband put his arm around the girl and "felt her breast". Mrs. Johnson advised Mrs. Canterbury, "Why don't you knock the hell out of him?" —to which the girl replied, patting defendant's hand, "Poor little boy".

She also testified about Johnson's efforts to assist Mrs. Canterbury in obtaining employment at the Coliseum and of several other minor incidents between the two that she observed. There was introduced in evidence a note that Mrs. Canterbury wrote defendant, reading: "Koisan, I wuv you this much and I am thinking of you all the time. I sure hope you wuv me this much. Love, Kay."

Defendant, Mrs. Canterbury and her husband denied that there was any improper relationship. Mr. Canterbury testified that he and his wife had been on friendly terms with the Johnsons and enjoyed pleas-

ant times with them, which included dinners and trips. He said that his wife was "an easy going, very soft person"; that it was her nature to be very affectionate; that "she never wants to hurt anyone's feelings and wants to be pleasant to everyone". He characterized the relationship between defendant and his wife as a platonic one and no thought occurred to him of any other kind or he would have put a stop to it.

The above is a summary of the evidence of defendant's cruelty to plaintiff. The alleged assault that occurred in Maryland nearly two decades prior to the divorce suit is remote in time and is not corroborated.

The only testimony of the occurrence following the Wedgewood Theatre party, and the alleged assault on Mrs. Johnson by her husband on January 28, 1970, was given by plaintiff and defendant and is uncorroborated. There is no medical testimony as to the injuries sustained by Mrs. Johnson on the night of January 28, 1970. Her friend, Ruth R. Mingee, was in the hospital at the time and was visited by Mrs. Johnson the next morning. She noticed that Mrs. Johnson "couldn't hardly talk" and that her left jaw and right hand was bruised and swollen. When a Dr. Stout came into the room he "briefly went over her [plaintiff's] neck and her jaw". All that this witness knew about the alleged assault was told her by Mrs. Johnson.

Mrs. Mingee did corroborate plaintiff's testimony of the incident that occurred at the dining room table, and observed with disapproval the conduct of defendant and Mrs. Canterbury.

Concerning the relationship of defendant and Mrs. Canterbury, it suffices to say that the evidence may have shown conduct between the two that was indiscreet and indelicate. It was certainly objectionable, offensive and embarrassing to Mrs. Johnson. Mr. Canterbury attached no significance to it. Mrs. Canterbury thought Johnson's actions childish. Defendant said he was fond of Mrs. Canterbury "but didn't feel toward [her] anything more than as a friend". The record does not show any act of immorality or adultery.

■ We now examine the record for evidence of desertion by Mrs. Johnson. Defendant alleges that she willfully deserted him and the court found such desertion occurred on or about February 25, 1970.

Admittedly the parties occupied separate bedrooms following the Wedgewood Theatre incident on November 19, 1969. However, the circumstances surrounding this incident indicate that plaintiff did not

regard or intend it as a permanent separation. Apparently she was hoping to obtain better treatment from her husband. Furthermore, there is nothing to indicate that defendant objected to occupying separate bedrooms. There is no testimony in the record of any permanent and unexcused refusal of sexual relations by either party. Absent clear evidence of such refusal, a showing of mere cessation of intercourse is not sufficient to prove cruelty or constructive desertion. *Carneal* v. *Carneal*, 211 Va. 162, 176 S. E. 2d 305 (1970).

The most serious altercation which occurred between the parties was on January 28, 1970. Notwithstanding this the parties continued to live together until February 25, 1970 when plaintiff filed her bill and process was served on defendant. On that day plaintiff, together with Mrs. Mingee, left Hampton to visit relatives in Pennsylvania and Maryland. She testified that it was not a coincidence that she left on that particular day. She did not want to be in the city, and in their home, when the papers were served on her husband. She remained away from Hampton from February 25, 1970 to March 12, 1970, during which time she visited various members of their family. She arrived back at their home on March 12th, and her husband noted her presence there the following morning. They both continued to live in the same house until the court ordered defendant, on March 20, 1970, to remove himself and belongings therefrom.

Defendant claims that about the time of the filing of the divorce suit, plaintiff cashed certain government bonds in the amount of $600-700, and made purchases on credit aggregating $800-900. Plaintiff's explanation was that as a result of hospitalization her weight had declined from 139 pounds to 124 pounds which necessitated the purchase of a new wardrobe.

We find no evidence in the record that supports defendant's allegation of desertion. Plaintiff testified she told defendant she was going to see her brother the night before she left. We attach no significance to the fact that plaintiff timed her trip so as to be absent from their home on the day process was served on defendant. Manifestly this was done to avoid what could have been another unpleasant and violent episode in the lives of the parties. In *Hudgins* v. *Hudgins*, 181 Va. 81, 87, 23 S. E. 2d 774, 777 (1943), we said:

"It seems well settled that the absenting of one spouse from the other after the institution and during the pendency of a suit for a divorce, as here, is not desertion in law and it is not an act upon

which a suit for desertion may be predicated. Indeed, in many cases it is highly proper that such physical separation should be, and under many circumstances it is commendable."

Subsequent to the filing of the bill and cross-bill, an incident occurred involving the parties and during which Mrs. Johnson is alleged to have shot at her husband. The facts surrounding the incident are controverted, and Mrs. Johnson denies the charge. We have not commented upon this evidence for "[t]he act relied upon for divorce must be alleged and proved to have occurred prior to the bringing of the suit, not based upon some act or conduct alleged to have taken place during its pendency". *Beckner v. Beckner*, 204 Va. 580, 583, 132 S. E. 2d 715, 717-18 (1963).

It can be concluded from the evidence adduced in this case that for a period of time the marriage of these parties had been deteriorating and they had been drifting apart. The responsibilities of defendant as City Manager of Hampton were many and varied, and his official duties did require that he be absent from home on many evenings. It is significant that nowhere in the record does it appear that Mrs. Johnson ever accompanied her husband on these social occasions. She was certainly not present at the Wedgewood Theatre party on November 19, 1969. Whether her absence was from choice, or from lack of an invitation from her husband, is not shown. One gathers from the record that there seems to have been little harmony or happiness in the household in recent years, and their lives together were marked with arguments, jealousy, discord, outbursts of temper and some physical assaults. Whatever the reason for the discord, plaintiff justifies her bill for divorce on the ground of cruelty. Notwithstanding the various acts of cruelty she alleges occurred, plaintiff continued to live in the same house with defendant up until the time that she filed for divorce, and for a short time during the pendency of the suit.

A decree of absolute divorce should not be granted unless the evidence relied upon proves willful desertion without justification or excuse and the burden of establishing this rests on the party alleging it. *Owens v. Owens*, 197 Va. 681, 90 S.E. 2d 776 (1956). Defendant has failed to prove willful desertion of him by plaintiff.

Assuming for argument, but not deciding, that the various episodes and incidents, and the conduct of defendant, constituted cruelty to plaintiff, her evidence of these acts is not corroborated,

except by the evidence or admissions of defendant, and this is not sufficient.

■ A divorce cannot be granted merely because a husband and wife are unable to live together in peace and harmony. *Upchurch v. Upchurch,* 194 Va. 990, 76 S. E. 2d 170 (1953). "The law . . . requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations, rendering the association intolerable." *Butler* v. *Butler,* 145 Va. 85, 88, 133 S. E. 756, 757 (1926).

While we have here a deplorable marital situation, and the ends of society would perhaps be better served if the parties were divorced, that does not warrant the granting of a divorce upon insufficient evidence, or upon uncorroborated evidence where corroboration is required. We observe here as we did in *Graham* v. *Graham,* 210 Va. 608, 617, 172 S. E. 2d 724, 730 (1970):

"This case gives support to the action of the General Assembly of Virginia in providing in Code § 20-91 that a divorce may be decreed on the application of either party if and when the husband and wife have lived separate and apart without any cohabitation and without interruption for two years."

Accordingly, the decrees granting defendant a divorce *a mensa et thoro* and a divorce *a vinculo matrimonii* from plaintiff are reversed, set aside and annulled. An order will be entered dismissing plaintiff's bill and defendant's cross-bill.

The effect of our decision is to deny a divorce to either party from the other on the grounds alleged in their pleadings.

*Reversed.*